**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| CAA Industries, Ltd., and, | : | |
| | : | |
| Command Arms Accessories, LLC, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | No.: 19-cv-6982 |
| | : | |
| ME Technology Inc., | : | |
| | : | |
| Defendant. | : | |

## Notice of Motion For Preliminary Injunction

PLEASE TAKE NOTICE that Plaintiffs, by and through their undersigned counsel, will move this Court before the Honorable Louis L. Stanton, United States District Judge, at the United States Courthouse, 500 Pearl Street, New York, New York, at a date and time to be determined by the Court, for an Order, pursuant to Fed.R.Civ.P. 65(a), 15 U.S.C §1116, and 35 U.S.C. §283, enjoining Defendant from infringing and diluting Plaintiff's federally-registered and common law trademarks, infringing their U.S. patent, and returning Plaintiff's website, all identified in Plaintiffs' proposed preliminary injunction order and supporting memorandum of law, declaration of Moshe Oz, and exhibits, until a final hearing and determination of the merits in this action.  Unless and until Defendant is restrained and enjoined by Order of this Court, Plaintiffs will suffer immediate and irreparable harm, injury, loss and damage.  Prior to the issuance of the annexed proposed order, Plaintiffs are ready, willing and able to execute a bond payable to Defendant, or provide other security in such sum as this Court deems proper for such costs and damages, if any, as may be incurred or suffered by any party found to have been wrongfully enjoined or restrained.

PLEASE TAKE NOTICE that pursuant to Local Civil Rule 6.1(b) any opposing papers or answering memoranda are to be served within fourteen days after service of this motion.

WHEREFORE, Plaintiffs respectfully requests that this Court enter the annexed Proposed Order.

Date: August 19, 2019

By: /s/ Frank A. Mazzeo
    Frank A. Mazzeo (FM0837)
    Joseph M. Konieczny, Sr. (pro hac vice appl.to be filed)
    808 Bethlehem Pike, Suite 200
    Colmar, PA 18915
    Telephone: 215-997-0248
    Facsimile: 215-997-0266
    fmazzeo@rmkiplaw.com
    jkonieczny@ryderlu.com

    Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that a copy of Plaintiff's Notice of Motion for Preliminary Injunction, Memorandum of Law in Support of Motion for Preliminary Injunction, Proposed Preliminary Injunction Order, Declaration of Moshe Oz, and Exhibits In Support of Plaintiffs' Motion for Preliminary Injunction are being served on defendant ME Technology, 3901 N.E. 12th Avenue #400, Pompano Beach, Florida 33064, by first-class, postage-prepaid U.S. mail on the date indicated below.

Dated: August 19, 2019

Joseph M. Konieczny, Sr.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| CAA Industries, Ltd., and, | : | |
| | : | |
| Command Arms Accessories, LLC, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | No.: 19-cv-6982 |
| | : | |
| ME Technology Inc., | : | |
| | : | |
| Defendant. | : | |

### Plaintiff's Memorandum Of Law In
### Support Of Motion For Preliminary Injunction

Plaintiffs, CAA Industries, Ltd. and Command Arms Accessories, LLC (collectively

"CAA Industries"), respectfully submits this memorandum of law in support of its Motion for

Preliminary Injunction pursuant to Fed.R.Civ.P. 65, 15 U.S.C. § 1116 and 35 U.S.C. § 283.

1

# Table of Contents

I.   INTRODUCTION ...................................................................................................... 1

II.  STATEMENT OF FACTS ....................................................................................... 1

   A.  Background of CAA Industries ....................................................................... 1

   B.  Background of Command Arms Accessories, LLC ........................................ 4

   C.  Background of ME Technology........................................................................ 7

   D.  Plaintiff's Rebranding Activities in 2010 ....................................................... 7

   E.  Plaintiff's Rebranding Activities in 2015 ....................................................... 8

   F.  Development of the CAA GEAR UP Websit ................................................ 12

   G.  Development of the RONI and Micro RONI Conversion Kits........................ 13

   H.  Defendants' Trademark Infringement............................................................ 15

   I.  Defendants' Patent Infringement .................................................................. 17

   J.  Defendant's Website Conversion and Domain Name Hijacking ................... 17

III. THE LEGAL STANDARD FOR PRELIMINARY INJUNCTIVE RELIEF IN
TRADEMARK AND PATENT CASES ................................................................. 18

   A.  CAA Industries Is Likely To Succeed On The Merits of Its Counts For Federal Statutory
Trademark Infringement, False Designation of Origin, and Common Law Trademark
Infringement.................................................................................................... 20

      1.  CAA Industries Has Proven Ownership of All of the CAA Marks Through Its
Incontestable Registration and Proof of First Adoption and Continuous Use...... 21

      2.  ME Technology's Hold-Over Use of the CAA Marks Creates Confusion as to the
Source or Sponsorship of Its Firearms' Accessory Products................................ 24

   B.  CAA Industries Will Likely Succeed on the Merits for Patent Infringement.................. 32

i

1. CAA Industries' Patent Is Presumed Valid and ME Technology Will Not Be Able To Present Evidence to Substantially Question Validity ...................................... 33

2. CAA Industries Can Demonstrate a Strong Case for Infringement of the '803 Patent ....................................................................................................................... 34

C. CAA Industries Is Suffering Irreparable Harm and Remedies at Law Are Inadequate to Compensate CAA Industries for that Harm ....................................................... 37

1. CAA Industries' Loss of Control Over Its Name, Reputation and Goodwill Constitutes Irreparable Harm for Which Monetary Damages Are Inadequate to Compensate Plaintiff .............................................................................................. 38

2. CAA Industries' Loss of Its Statutory Right to Exclude Constitutes Irreparable Harm for Which Monetary Damages Are Inadequate to Compensate Plaintiff ... 39

3. CAA Industries' Loss of Market Share Constitutes Irreparable Harm for Which Monetary Damages Are Inadequate to Compensate Plaintiff .............................. 41

D. The Balance Of Hardships Weighs Heavily in CAA Industries' Favor .......................... 42

1. Any Hardship on ME Technology is Self-Inflicted ............................................... 42

2. CAA Industries Seeks Only Limited Equitable Relief ......................................... 43

3. Potential Injury to Defendant Is Subservient to Protection of the Public Interest and the Trademark Rights of CAA Industries ...................................................... 44

E. Public Interest Favors Issuance of an Injunction to Enjoin Defendant's Use of the Infringing Marks ............................................................................................................ 45

1. Preventing Consumer Confusion Serves the Public Interest ................................ 45

2. Protecting Public Safety Serves the Public Interest ............................................. 46

IV. BOND ....................................................................................................................................... 47

V. CONCLUSION ......................................................................................................................... 48

ii

# Table of Authorities

## Cases

*1-800 Contacts, Inc. v. WhenU.com*, 309 F. Supp. 2d 467 (S.D.N.Y. 2003) ............................... 36

*1-800 Contacts, Inc. v. WhenU.com*, 414 F.3d 400 (2d Cir. 2005) .............................................. 36

*Acumed LLC v. Stryker Corp.,* 551 F.3d 1323 (Fed. Cir. 2008)................................................... 46

*AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341 (9th Cir. 1979). ................................................ 37, 49

*Arrow Fastener Co., Inc. v. Stanley Works*, 59 F.3d 384 (2d Cir. 1995) ................................... 30

*Atlas Powder Co. v. Ireco Inc.*, 773 F.2d 1230 (Fed. Cir. 1985);................................................. 46

*Aventis. v. Barr Labs., Inc.*, 411 F.Supp.2d 490 (D. N.J.) ........................................................... 39

*Bausch & Lomb, Inc. v. Barnes-Hind/Hydrocurve, Inc.,* 796 F.2d 443 (Fed. Cir. 1986)....... 40, 49

*Black Hills Jewelry Manufacturing Co. v. Gold Rush, Inc.*, 633 F.2d 746 (8th Cir. 1980).......... 52

*Blumenthal Distrib. v. Exec. Chair, Inc.*, No. CV-10-1280 (CBA), 2010 U.S. Dist. LEXIS
    142193 (E.D.N.Y. Nov. 9, 2010).......................................................................................... 45

*Bosch v. Pylon Mfg. Corp.,* 659 F.3d 1142 (Fed. Cir. 2011). ................................................ 46, 48

*Brennan's, Inc. v. Brennan's Rest., LLC*, 360 F.3d 125 (2d Cir. 2004)....................................... 27

*Brooktree Corp. v. Advance Micro Devices, Inc.*, 977 F.2d 1555 (Fed. Cir. 1992) .................... 40

*Bulman v. 2BKCo, Inc.*, 882 F. Supp. 2d 551 (S.D.N.Y. 2012) ............................................. 49, 51

*Canon Computer Sys. v. Nu-Kote Int'l., Inc.*, 134 F.3d 1085 (Fed. Cir. 1998) ........................... 47

*Christian Louboutin S.A., et al. v. Yves Saint Laurent Am. Holding, Inc., et al.*,
    696 F.3d 206 (2d Cir. 2012)................................................................................................. 25

*Citigroup Inc. v. City Holding Co.*, 171 F. Supp. 2d 333 (S.D.N.Y. 2001).................................. 33

*Citizens Sec., Inc. v. Bender,* No. 1:19-CV-916 (MAD/DJS), 2019 U.S. Dist. LEXIS
    128571 (S.D.N.Y. Aug. 1, 2019). ........................................................................................ 49

*Coach, Inc. v. O'Brien*, No. 10 Civ. 6071 (JPO)(JLC), 2012 WL 1255276 (S.D.N.Y. Apr. 13,
    2012) ................................................................................................................................ 25, 26

*eBay Inc. v. MercExchange, LLC*, 547 U.S. 388 (2006)............................................ 26, 43, 45, 46

*Empresa Cubana Del Tabaco v. Culbro Corp.*, 2004 U.S. Dist. LEXIS 744
  (S.D.N.Y. Apr. 30, 2004) ............................................................................ 44, 45

*Excelled Sheepskin & Leather Coat Corp. v. Or. Brewing Co.*, 897 F.3d 413
  (2d Cir. 2018) ...................................................................................................... 28

*Fabrication Enters., Inc. v. Hygenic Corp.*, 64 F.3d 53 (2d Cir. 1995) ................... 25, 27

*Fischer v. Forrest*, 286 F. Supp. 3d 590 (S.D.N.Y. 2018) ......................................... 36

Flores v. Town of Islip, 382 F. Supp. 3d 197 (E.D.N.Y. 2019) ............................... 49

*FTC v. Crescent Publ'g Grp., Inc.*, 129 F. Supp. 2d 311 (S.D.N.Y. 2001) .................. 25

*Garvey Corp. v. Barry-Wehmiller Design Group, Inc.*, 365 F. Supp. 2d 893
  (N.D. Ill. 2005) ................................................................................................... 46

*Gucci v. Gucci Shops*, 688 F. Supp. 916, 926 (S.D.N.Y. 1988) ............................... 36

*HH Robertson Co. v. United Steel Deck, Inc.*, 820 F.2d 384 (Fed. Cir. 1987) ......... 39, 45

*Hybritech, Inc. v. Abbott Labs.*, 849 F.2d 1446 (Fed. Cir. 1988) ......................... passim

*Hydro-Dynamics, Inc. v. George Putnam & Co., Inc.*, 811 F.2d 1470 (Fed. Cir. 1987) ........ 28

*Interactive Gift Express, Inc. v. Compuserve, Inc.*, 256 F.3d 1323 (Fed. Cir. 2001) .......... 39

*Issa v. Sch. Dist. of Lancaster*, 847 F.3d 121 (3d Cir. 2017) ............................... 51

*Katz v. Modiri*, 283 F. Supp. 2d 883 (S.D.N.Y. 2003) ....................................... 37

*Knowles-Carter v. Feyonce, Inc.*, 347 F. Supp. 3d 217 (S.D.N.Y. 2018) ................... 31

*Kuklachev v. Gelfman*, 629 F. Supp. 2d 236 (E.D.N.Y. 2008). ............................... 44

*La Societe Anonyme des Parfums le Galion v. Jean Patou, Inc.*, 495 F.2d 1265
  (2d Cir. 1974) ................................................................................................ 25, 28

*Lambda Elecs. Corp. v. Lambda Tech., Inc.*, 515 F. Supp. 915 (S.D.N.Y. 1981) ......... 32

*Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.*, 192 F.3d 337 (2d Cir. 1999) ......... 27

*Larami Corp. v. Lanard Toys Ltd.*, 1992 WL 13683 (E.D. Pa. Jan. 24, 1992) ............... 39

*Lawn Tennis Ass'n v. British Tennis Agency, Inc.*, 1986 U.S. Dist. LEXIS 22852
  (S.D.N.Y. July 14, 1986) ................................................................................... 32

iv

*Les Ballets Trockadero De Monte Carlo, Inc. v. Trevino*, 945 F. Supp. 563
    (S.D.N.Y. 1996) ................................................................................................ 51

*Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867 (2d Cir. 1986) ..................... 36

*Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 454 F.3d 108 (2d Cir. 2006). ....................... 31

*Mint, Inc. v. Amad*, 2011 U.S. Dist. LEXIS 49813 (S.D.N.Y. 2011) ........................................... 51

*Mister Softee, Inc. v. Tsirkos*, No. 14- CV-1975-LTS-RLE, 2015 U.S. Dist. LEXIS 158290
    (S.D.N.Y. Nov. 23, 2015) ................................................................................. 24

*Mitsubishi Motors N. Am. Inc. v. Grand Auto., Inc.*, No. CV 18-814 (SJF) (SIL),
    2018 U.S. Dist. LEXIS 72349 (E.D.N.Y. Apr. 30, 2018) ......................................... 44

*Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254 (2d Cir. 1987) .............................. 36

*My-T Fine Corp. v. Samuels*, 69 F.2d 76 (2d Cir. 1934) ................................................ 48

*N.Y.C. Triathlon, LLC v. NYC Triathlon Club, Inc.*, 704 F. Supp. 2d 305 (S.D.N.Y. 2010) ....... 44

*Nabisco, Inc. v. PF Brands, Inc.*, 50 F. Supp. 2d 188 (S.D.N.Y. 1999) ..................................... 26

*New York City Triathlon*, 704 F. Supp. 2d 305 (S.D.N.Y. 2010) ................................................ 51

*Norbrook Labs Ltd. v. G.C. Hanford Mfg., Co.*, 126 Fed. Appx. 507 (2d Cir. 2005). ................. 46

*Oakley, Inc. v. Sunglasses Hut Inter.*, 316 F.3d 1331 (Fed. Cir. 2003) ..................................... 39

*Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187 (3rd Cir. 1990) ..................... 44

*Osmose, Inc. v. Viance, LLC*, 612 F.3d 1298 (11th Cir. 2010) .................................................. 52

*Paco Sport, Ltd. v. Paco Rabanne Parfums*, 86 F. Supp. 2d 305 (S.D.N.Y. 2000) ..................... 49

*Panduit Corp. v. Dennison Mfg. Co.*, 810 F.2d 1561 (Fed. Cir. 1987) ....................................... 40

*Patsy's Italian Rest., Inc. v. Banas*, 658 F.3d 254 (2d Cir. 2011) .............................................. 24

*Perfect Fit Indus., Inc. v. Acme Quilting Co.*, 618 F.2d 950 (2d Cir. 1980) ................................ 37

*Pfizer, Inc. v. Teva Pharms. USA, Inc.*, 429 F.3d 1364 (Fed. Cir. 2005). ................................... 49

*Polaroid Corp v. Polarad Elecs. Corp.*, 287 F.2d 492 (2d Cir. 1961) ............................. 30, 31, 32

*Polymer Techs., Inc. v. Bridwell*, 103 F.3d 970 (Fed. Cir. 1996) ..................................... 25, 45, 48

*Power Test Petroleum Distribs., Inc. v. Calcu Gas, Inc.*, 754 F.2d 91 (2d Cir. 1985)................. 44

*Processed Plastic Co. v. Warner Communications, Inc.*, 675 F.2d 852 (7th Cir. 1982). ....... 44, 45

*Purdue Pharma L.P. v. Boehringer Ingelheim GmbH,* 237 F.3d 1359 (Fed. Cir. 2001).............. 38

*Reckitt Benckiser Inc. v. Motomco Ltd.*, 760 F. Supp. 2d 446 (S.D.N.Y. 2011) ......................... 52

*Reebok Int'l Ltd., v. Baker, Inc.*, 32 F.3d 1552 (Fed.Cir. 1994). .................................................. 45

*Rescuecom Corp. v. Google, Inc.*, 562 F.3d 123 (2d Cir. 2009)................................................... 50

*Rexall Sundown, Inc. v. Perrigo Co.*, 651 F. Supp. 2d 9 (E.D.N.Y. 2009) .................................. 52

*Rubbermaid Commercial Prods., Inc. v. Contico Int'l, Inc.*, 836 F. Supp. 1247
   (W.D. Va. 1993)...................................................................................................................... 49

*Saget v. Trump*, 375 F. Supp. 3d 280 (E.D.N.Y. 2019) ............................................................... 51

*Salinger v. Colting*, 607 F.3d 68 (2d Cir. 2010) ............................................................... 25, 26, 43

*Sanofi-Synthelabo v. Apotex*, 470 F.3d 1368 (Fed. Cir. 2006). .................................................... 40

*Schutte Bagclosures Inc. v. Kwik Lok Corp.*, 48 F. Supp. 3d 675 (S.D.N.Y. 2014).................... 30

*Smith Int'l, Inc. v. Hughes Tool Co.,* 718 F.2d 1573 (Fed. Cir. 1983) ....................... 25, 39, 45, 52

*Sola Franchise Corp. v. Solo Salon Studos, Inc.*, No. CV 14-946 (JS) (AKT),
   2015 U.S. Dist. LEXIS 38490 (E.D.N.Y. Feb. 9, 2015).......................................................... 52

*Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97 (2d Cir. 2009). ........................... 32

*Syntex Labs. V. Norwich Paracal Co.*, 437 F.2d 566 (2d Cir. 1971)............................................ 30

*Tally-Ho, Inc. v. Coast Cmty. Coll. Dist.*, 889 F.2d 1018 (11th Cir. 1989).................................. 28

*Tate Access Floors, Inc. v. Interface Architectural Resources, Inc.*, 279 F.3d 1357
   (Fed. Cir. 2002)....................................................................................................................... 40

*Tecnimed SRL v. Kidz-Med, Inc.*, 763 F. Supp. 2d 395 (S.D.N.Y. Jan.18, 2011) ....................... 51

*The Marks Org., Inc. v. Joles*, 784 F. Supp. 2d 322 (S.D.N.Y. 2011) ................................. 50

*Time, Inc. v. Petersen Publ'g Co.*, 173 F.3d 113 (2d Cir. 1999)................................................... 33

*Tivo, Inc. v. Echostar Communications Corp.*, 446 F.Supp.2d 664 (E.D. Tex. 2006) ................ 47

*Tri-Star Pictures, Inc. v. Unger*, 14 F. Supp. 2d 339 (S.D.N.Y. 1999). ....................................... 26

*Twentieth Century Fox Film Corp. v. Marvel Enterprises, Inc.*, 220 F. Supp. 2d 289
   (S.D.N.Y. 2002) ....................................................................................................... 26

*United States v. Nam Ping Hon*, 904 F.2d 803 (2d Cir. 1990) ..................................................... 30

*Van Praagh v. Gratton*, 993 F. Supp. 2d 293 (E.D.N.Y. 2014) ................................................... 26

*Wayne-Gossard Corp. v. Sondra, Inc.*, 434 F.Supp. 1340 (D.C. Pa. 1977),
   aff'd, 579 F.2d 41 (3rd Cir. 1978). ........................................................................... 49

*Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008)...................................... 26

*WPIX, Inc. v. ivi, Inc.,* 691 F.3d 275 (2d Cir. 2012). ........................................................... 48, 50

*Yale Elec. Corp. v. Robertson*, 26 F.2d 972 (2d Cir. 1928)....................................................... 44

**Statutes**

15 U.S.C. § 1065.................................................................................................................. 27, 34

15 U.S.C. § 1115(a).............................................................................................................. 27, 33

15 U.S.C. § 1116...................................................................................................................... 24

35 U.S.C. § 282........................................................................................................................ 39

35 U.S.C. § 283........................................................................................................................ 25

**Other Authorities**

T.M.E.P. 1209.......................................................................................................................... 34

**Treatises**

3 J. McCarthy on Trademarks and Unfair Competition, § 23:6 ................................................... 36

3A Louis Altman, Callman on Unfair Competition, Trademarks & Monopolies § 21:10 .......... 38

## I.   INTRODUCTION

CAA Industries, Ltd. is a well-known manufacturer and global leader in the firearms accessories industry.  CAA Industries owns numerous patents and trademarks for its products including its famous pistol carbine conversion kits sold under the marks RONI and Micro RONI. Since 2007, CAA Industries had been distributing its products in the U.S. through its exclusive U.S. distributor, defendant ME Technology, Inc.  CAA Industries recently terminated the parties' manufacturer-distributor relationship and terminated ME Technology's license to use CAA Industries' numerous trademarks.  Despite such termination, ME Technology is now directly competing with CAA Industries, using several of CAA Industries' trademarks, including its most famous mark CAA.  ME Technology is also selling a "knock-off" pistol carbine conversion kit that infringes one of CAA Industries' patents and, to add insult to injury, is selling the knock-off conversion kit using CAA Industries' famous marks CAA, RONI and Micro RONI. Accordingly, CAA Industries moves this Court for an Order enjoining such unlawful conduct. CAA Industries has no adequate remedy at law.

## II.   STATEMENT OF FACTS

### A.   Background of CAA Industries

Plaintiff CAA Industries, Ltd. ("CAA Industries"), located in Qiryat Gat, Israel, is a long-established designer, developer and world-class producer of high-quality weapons, weapon modernization accessories, optics, tools and upgrades, which services Armed Forces, Law Enforcement and gun enthusiasts across the world.  Declaration of Moshe Oz ¶1 ("Oz decl."). CAA Industries has invented many weapon modernization accessories that have become the benchmark for this industry. *Id.*  CAA Industries outfits firearms for maximum performance in any environment. *Id.*  These accessories improve the weapon's accuracy, grip, and aim.  CAA

Industries' accessories include pistol carbine conversion kits, Picatinny rails and rail systems, flip-up sights, receivers, charging handles, butt stocks, bipods, cheek rests, magazines, couplers, forearm and pistol grips, flashlight mounts, holsters, bi-pods, slings, and rail covers. *Id.* One of CAA Industries' 2019 product catalogs is shown in Exhibit 6. *Id.* These products are sold worldwide through dealers, distributors and directly to customers. *Id.*

CAA Industries (formerly known as Tactical Arms Ltd. d/b/a CAA-Tactical[1]) was established on September 19, 2007. Exh. 8; Oz decl. ¶2. Since then, CAA Industries has grown into a global industry leader in the firearms accessories industry. Oz decl. ¶2. CAA Industries' products are exported and sold throughout the United States, Europe, South America, Africa, Asia and the South Pacific. *Id.*

CAA was founded by Moshe Oz and Eldad Oz, who initially owned 70% and 30% of the company, respectively. Oz decl. ¶3. Moshe Oz is a prolific inventor, product designer and developer. *Id.* He is an infrastructure entrepreneur with an M.B.A. from the University of Derby, United Kingdom, and has more than 15 years' experience in management, marketing and business development and growth. *Id.* Over the past 11 years, Moshe Oz has been awarded 9 U.S. patents and many corresponding foreign patents relating to firearms accessories including:

| U.S. Patent No. | Issue Date | Title | Assignee |
|---|---|---|---|
| 9,897,406 | 2/20/2018 | Upgrade Kit for Assault Rifle | CAA Industries Ltd. |
| D784,480 | 4/18/2017 | Optic Sight | Hartman Optics Ltd. |
| 9,593,906 | 3/14/2017 | Electro-Optical Optic Sight | Hartman Optics Ltd. |
| 8,887,432 | 11/18/2014 | Handgun Converter | CAA Industries, Ltd. |
| 8,312,803 | 11/20/2012 | Semi Automatic Pistol Slide Pull | Tactical Arms Ltd. |
| 8,151,503 | 4/10/2012 | Assault Rifle Magazine Ejector Extension | Tactical Arms Ltd. |
| 7,640,688 | 1/5/2010 | Adjustable Cheek Reset and Accessory Rail for Firearms | Command Arms Accessories, LLC |
| 7,610,711 | 11/3/2009 | Telescoping Leg | TDI Arms, Ltd. |
| 7,428,794 | 9/30/2008 | Telescoping Stock | None |

---

[1] The history of Tactical Arms Systems, Ltd. is described in greater detail *infra.*

Exh. 9; Oz decl. ¶3.  Some of Moshe Oz's most innovative inventions include: (1) the AK ALPHA assault rifle, which is an upgrade to the traditional Kalashnikov AK assault rifle; and (2) the RONI® and Micro RONI® pistol carbine conversion kits, which are the subject of plaintiffs' patent and trademark infringement claims, discussed *infra*. Oz decl. ¶ 4.

Prior to private enterprise, Moshe Oz served from 1986-1991 in the Israel Defense Force ("IDF') Army Special Forces. Oz decl. ¶5.  From 1991-2004, he served in a Police Special Forces Undercover Unit, where he achieved the rank of Major. *Id.*  While in the Special Forces Undercover Unit, Moshe Oz oversaw helicopter units, anti-terrorism units, terrorist negotiating units, and Undercover Unit #33. *Id.*  Mr. Oz was awarded with the Excellent Service Award by the President of Israel in 1996. *Id.*  Since leaving the military, Mr. Oz has been using his experience with firearms to design and develop many products. *Id.*

Eldad Oz also started his career in the Israeli military and served from 1997 until 2002. Oz decl. ¶6.  He graduated from Army Officer School and reached the rank of Lieutenant. *Id.*  He also attained the position of Head of Instructors at the Anti-Terrorism School in Israel. *Id.*  From 2003 until 2005, Eldad Oz served in the Israeli Secret Service and was stationed at the Israeli Embassy in New York. *Id.*

CAA Industries currently operates a 17,222 sq. ft. manufacturing facility in Qiryat-Gat, Israel. Exh. 7; Oz decl. ¶7.  Among other equipment, the manufacturing facility houses 12 CNC machines as well as a variety of other manufacturing equipment. *Id.*  Until as recently as late 2018, CAA Industries had 120 employees in manufacturing, shipping, warehousing, engineering and sales. *Id.*  The employees had from 12-15 years of experience with most of them being former IDF members. *Id.* However, CAA Industries staff has now been reduced to about 30

3

employees due to defendant's infringement and other unlawful acts. *Id.* CAA Industries also previously owned a polymer injection molding facility with 20 injection molding machines. *Id.* However, this injection molding facility was sold in 2018 to pay the costs of keeping CAA Industries in business due to a separate business dispute with ME Technology, which is the subject of a separate litigation in Florida. *Id.*

CAA Industries has developed a reputation for designing, manufacturing and selling only the highest quality firearms accessories. Oz decl. ¶8. CAA Industries exercises extensive quality control at its manufacturing plants and has a manufacturing strategy of defect prevention rather than defect detection. *Id.* CAA Industries uses statistical tools throughout its manufacturing processes to monitor the performance and to assure effective quality control of each process step. *Id.* CAA Industries is registered with the State of Israel ("SoI") Ministry of Justice. Moshe Oz is registered with The SoI Ministry of Homeland Security for Firearms License and Firearms Manufacturing. Exh. 10; Oz decl. ¶8. CAA Industries is certified by IQNet Association, The International Certification Network, and is audited and registered by SIL-QCD as conforming to ISO 9001 from the Standards Institution of Israel, QA Management Systems RvA C 096, International Accreditation Forum. Exh. 8.

**B.      Background of Command Arms Accessories, LLC**

Plaintiff Command Arms Accessories, LLC ("CAA, LLC") is a Pennsylvania limited liability company, entity no. 3996905. Exh. 11. CAA, LLC is owned equally by Moshe Oz and Eldad Oz, and was formed on December 10, 2010. Oz decl. ¶9. Through a series of name changes and asset purchases, CAA, LLC purchased the exclusive rights to use the marks CAA, COMMAND ARMS ACCESSORIES, and the registered mark **CAA** [2] (the "Assigned

---

[2] U.S. Reg. No. U.S. 3,559,649, now abandoned.

Marks") on November 16, 2010 from a Pennsylvania limited liability company, entity no.

3315764, which at the time was also named Command Arms Accessories, LLC ("CAA 764")[3].

*Id.*

Moshe Oz entered the commercial firearms business in 2002 by forming an Israel-based

company TDI Arms Systems, Ltd. ("TDI Arms"), which was co-owned by Moshe Oz, Eldad Oz,

and David Oz. Oz decl. ¶10.  By 2004, TDI Israel had not effectively penetrated the U.S. market.

*Id.*  To do so, TDI Arms entered into a partnership agreement on December 13, 2004 with First

Samco, Inc. ("FSI"), a U.S. based firearms accessories company owned by Craig Fisher, which

had extensive, existing distribution relationships in the U.S. firearms industry. *Id.*  Further to the

December 13, 2004 Agreement, Eldad Oz and Craig Fisher formed CAA 764 in July 2005. Exh.

12; Oz decl. ¶10.

CAA 764 was owned equally by Eldad Oz, who served as its President in charge of day-

to-day operations, and Craig Fisher, who was not involved in the day-to-day operations.[4] Oz

decl. ¶11.  CAA 764 initially operated from a facility in Ivyland, Pennsylvania, then moved to a

larger facility in Bensalem, Pennsylvania. *Id.*  At formation, the intended purpose of CAA 764

was to serve as the exclusive distributor in the United States and Canada for the products of FSI[5]

and TDI Arms, and to engage in such other activities related to the sale of firearm accessories.

*Id.*  TDI Arms provided goods to CAA 764 through its U.S. subsidiary, TDI USA, Inc. ("TDI

USA"). *Id.*  CAA 764 actively operated from June 2005 until November 2010 using the marks

CAA, COMMAND ARMS ACCESSORIES and the registered mark **CAA** . *Id.*  CAA 764

was the first entity to use these marks in the United States in connection with the

---

[3] CAA 764 was owned by Eldad Oz and Craig Fisher.
[4] Before this time, Mr. Fisher was incapacitated due to a stroke.
[5] FSI's Fobus USA holster line was excluded from the product line

commercialization of firearms accessories. *Id.* With the exception of the RONI and Micro RONI conversion kits, CAA 764 distributed much of the same firearms accessory products as is distributed by ME Technology. *Id.*

CAA 764 operated smoothly from 2005 until 2008. Oz decl. ¶12. However, as a result of later-developed business disagreements between Fisher and Oz, a liquidating trustee was appointed to wind-down CAA 764 by liquidating and distributing its assets. *Id.* To do so, CAA 764 executed an asset purchase agreement dated November 16, 2010 ("Asset Purchase Agreement"), and transferred all[6] of its assets to Tactical Arms, Ltd., which assets included *inter alia* all furniture, machinery, equipment, molds, office supplies, accounts receivable, licenses and permits, customer lists and business records, present and future customers, inventory and, most importantly, the Assigned Marks associated with the business. Exh. 13; Oz decl. ¶12. Under the Asset Purchase Agreement, Tactical Arms, Ltd. paid $650,000 for the assets. *Id.* On December 16, 2010, CAA 764 changed names to CAA Liquidation and was eventually dissolved on December 17, 2012. Exh. 12; Oz decl. ¶12.

Tactical Arms, Ltd. is the previous name of plaintiff CAA Industries prior to December 2010. Oz decl. ¶13. On that day, Tactical Arms, Ltd. assigned all rights under the Asset Purchase Agreement to CAA Buyer, LLC on December 15, 2010 by an Assignment and Assumption Agreement ("Asset Assignment Agreement"). Exh. 14; Oz decl. ¶13. CAA Buyer, LLC was a newly-formed company co-owned equally by Moshe Oz and Eldad Oz Exh. 11; Oz decl. ¶13. On that same day, CAA Buyer LLC changed its name to Command Arms Accessories, LLC, which is the plaintiff CAA, LLC. *Id.* CAA, LLC is still 100% owned by Moshe Oz and Eldad Oz *Id.*

---

[6] The "excluded assets" defined in Schedule 1.2 were civil action nos. 2:10-cv-588-L and 2:10-cv-783-LDD.

### C.    Background of ME Technology

On August 20, 2007, long prior the Asset Purchase Agreement and Asset Assignment

Agreement, Moshe Oz and Eldad Oz formed their own distribution company, defendant ME

Technology, Inc. ("ME Technology"). Exh 15; Oz decl. ¶14.  ME Technology was initially

owned 100% by Moshe Oz and Eldad Oz[7] Oz decl. ¶14.  When ME Technology was formed in

2007, Eldad Oz was named President and served as President until 2017. *Id.*

ME Technology was established to exclusively market and sell arms accessories

manufactured by Tactical Arms, Ltd. (now CAA Industries). Oz decl. ¶15.  From October 2009

until December 15, 2010, while distributing the goods of Tactical Arms, Ltd., ME Technology

conducted business using the tradename and trademark "EMA Tactical." *Id.*  As discussed

below, after December 15, 2010, ME Technology changed tradenames and began using the

marks CAA, COMMAND ARMS ACCESSORIES, and **CAA** *by permission of* CAA, LLC.

*Id.*

### D.    Plaintiff's Rebranding Activities in 2010

When Moshe Oz and Eldad Oz executed the Asset Assignment Agreement on December

15, 2010, they were the sole owners of plaintiffs CAA, LLC and CAA Industries (formerly

Tactical Arms, Ltd), as well as defendant ME Technology. Oz decl. ¶16.  Having gained 100%

ownership of all three companies and 100% control of the marks CAA, COMMAND ARMS

ACCESSORIES and **CAA**, Moshe Oz and Eldad Oz began to consolidate and unify their

---

[7] The Oz brothers now own 49% while investors own 51%.

company branding in December 2010. *Id.* Their initial rebranding efforts in 2010 are summarized below:

| Company Name | Marketing Change |
|---|---|
| Command Arms Accessories, LLC | - Acquired the rights to the marks CAA, COMMAND ARMS ACCESSORIES and **CAA**  |
| ME Technology, Inc. | - Changed its tradename from EMA Tactical to Command Arms Accessories on or around December 15, 2010<br>- Adopted the mark CAA on or around December 15, 2010<br>- Adopted the mark CAA USA on or around December 15, 2010<br>- Replaced the mark **CAA**  with the registered mark[8] **CAA**  |
| Tactical Arms Systems, Ltd. | - Changed its corporate name from Tactical Arms System, Ltd. to CAA Industries, Ltd. in 2009<br>- Changed its tradename from CAA-Tactical to CAA Industries<br>- Adopted and is still using the mark CAA<br>- Adopted and used the mark **CAA**  until about 2016<br>- Adopted in 2016 and is currently using the mark  |

*Id.* These rebranding efforts were initiated, paid and implemented by Moshe Oz and Eldad Oz. Oz decl. ¶17. To this day, CAA Industries continues to use the marks CAA and COMMAND ARMS ACCESSORIES by license from CAA, LLC. *Id.*

### E. Plaintiff's Rebranding Activities in 2015

In January 2015, CAA Industries hired an Israeli marketing firm, Dan Alexander & Co., to develop new/modernized branding for CAA Industries, which would also be used by ME Technology. Oz decl. ¶18. From January 12, 2015 until about October 25, 2015, CAA Industries worked interactively with employees at Dan Alexander & Co. to develop the new branding. *Id.* Over that period of time, CAA Industries paid Dan Alexander & Co. more than $69,000 for its

---

[8] U.S. Reg. No. 4,352,407

rebranding and marketing work, which included several new trademarks, a new trade dress, new product packaging, and new product literature. Exh. 15-18; Oz decl. 18.  Exhibits 15, 17 and 18 are true and accurate copies of the branding strategy proposal, brand book and a DDP Mark document prepared by Dan Alexander & Co. for CAA Industries. *Id.*  Exhibit 16 is a true and accurate summary of the payments made by CAA Industries to Dan Alexander & Co. for rebranding. *Id.*

As part of the new branding and efforts to create goodwill and consumer recognition of its firearms accessories, CAA Industries replaced the standing soldier logo with a lion head logo ("Lion Head Mark") and a new composite mark ("Lion Head Composite Mark") (collectively "Lion Head Marks"). Exh. 17; Oz decl. ¶19.  CAA Industries has continuously used the Lion Head Marks since at least as early as 2016. Oz decl. ¶19.  ME Technology has used the Lion Head Marks since 2016 with permission from CAA Industries to sell authentic CAA Industries' products. *Id.*

As part of the new branding and efforts to create goodwill and consumer recognition of its firearms accessories, CAA Industries also adopted a digital design pattern mark ("DDP Mark"), which was also developed Dan Alexander & Co. on behalf of CAA Industries. Exh. 18; Oz decl. ¶20.  The DDP Mark has the appearance shown below. Oz decl. ¶20.



The DDP Mark consists of a series of interlocking rectangular or square shapes, which are colored either black, red, burnt orange, olive drab green or a darker green. Oz decl. ¶21. While there are singular squares or singular rectangles of a color, most squares and rectangles are combined into larger shapes of a single color, thereby forming irregular, unidentifiable, single color shapes with linear edges (Irregular Shapes). *Id.* These Irregular Shapes interlock to create an Irregular Pattern. *Id.*

CAA Industries has used the DDP Mark since at least as early as 2016. Oz decl. ¶22.  ME Technology has also used the DDP Mark since 2016 with permission from CAA Industries to sell authentic CAA Industries' products. *Id.*

As part of its rebranding and efforts to create goodwill and consumer recognition of its firearms accessories, CAA Industries also developed a distinctive trade dress for use on the packaging of its products, its website, business cards, promotional literature and letterhead (the "CAA Trade Dress"). Oz decl. ¶23.  An example of the CAA Trade Dress is shown in photographs 1 and 2 of Exhibit 1. *Id.*  The specifics of the CAA Trade Dress are set forth in exhibit 17 and include one or more of the following:

    a.  CAA Industries uses each of the CAA Marks in a unique way by combining unique colors, color combinations, fonts, arrangements of elements, and usage rules.

    b.  CAA Industries uses the DDP Mark as a strip or band or edging on product packaging, business cards, banners, letterhead, and the CAA Website (defined below).

    c.  The DDP mark uses the following unique combination of brand colors as defined on the Pantone color matching system: PMS 186 C; PMS 399 C; PMS 455 C; PMS 574 C; PMS 131C; white; and PMS Black C (the "Brand Colors").

    d.  All advertising copy is set in DIN font.

    e.  CAA Industries uses both a positive and negative version of the Lion Head Mark show as follows:  (positive) and  (negative.

f.  CAA Industries uses the Lion Head Mark in combination with a plurality of horizontal stripes as shown below and better seen in Photographs 1 and 2 of Exhibit1:



g.  CAA Industries uses the Lion Head Mark on different product visuals as shown below and follows:



h.  CAA Industries uses the Lion Head Mark superimposed on the DDP Mark as shown below:



i.  CAA Industries follows a plurality of restrictions regarding usage of the mark CAA and the Lion Head Mark (logos) including: use the positive (black) version of the logo on a white background, and the negative (white) version of the logo on a black background; use the positive (black) or negative (white) version of the logo on any of the Brand Colors backgrounds; don't change the logo's orientation; don't change the logo colors; don't combine Brand Colors together (logotype and background); don't outline the logo in any color; don't reconfigure or change the size or placement of any logo elements; don't bevel or emboss the logo; don't crop the logo in any way; don't present the logo in "outline only"; don't add "drop shadow effects to the logo; don't stretch or squeeze the logo to distort proportions; don't place the logo on a busy photograph or pattern that are not the DDP Mark; don't add "glow" effects to the logo; don't place the logo on colored backgrounds that are not the Brand Colors; don't put a while box around the logo when placed on a dark or busy background; and, don't color each letter in a different color.

j.  The mark CAA has the defined clear space area shown below:

11



.

  k. The Lion Head Composite Mark is used with the size relation shown below:



Oz decl. ¶23.  These and numerous other elements of the CAA Trade Dress were designed by

Dan Alexander & Co. on behalf of CAA Industries. *Id.*  CAA Industries has used the CAA Trade

Dress since at least as early as 2016. *Id.*  ME Technology has also used the CAA Trade Dress

since 2016 with permission from CAA Industries to sell authentic CAA Industries' products. *Id.*

  **F.**  **Development of the CAA GEAR UP Website**

   As part of the new branding and efforts to create goodwill and consumer recognition of

its firearms accessories, CAA Industries hired NGsoft Corporation at great expense to develop a

new website consistent with the new branding created by Dan Alexander & Co. Oz decl. ¶24.  A

development agreement with NGSoft was executed by Eldad Oz on behalf of CAA Industries on

or around January 4, 2015. *Id.*  In late 2015, CAA Industries worked interactively with

employees at NGsoft Corporation. *Id.*  Over that period of time, CAA Industries paid NGsoft

Corporation more than US$ 28,000. Exh. 19; Oz decl. ¶24.  A true and accurate summary of the

payments made by CAA Industries to NGsoft is shown in Exhibit 19. *Id.*  CAA Industries

independently developed the mark GEAR UP to use on the website and in the domain name. *Id.*

The new domain name *www.caagearup.com* was registered by Eldad Oz on December 8, 2015.

Exh. 20; Oz decl. ¶24.  The website went live shortly thereafter and was translated into both English and Hebrew.  Up until about August 2018, CAA Industries CAA Industries had control of the CAA Website and spent substantial resources to maintain the CAA Website. Oz decl. ¶24.

CAA Industries has used the mark GEAR UP and the *www.caagearup.com* website since December 2015. Oz decl. ¶25.  ME Technology has also used the *www.caagearup.com* website since 2016 with permission from CAA Industries to sell authentic CAA Industries' products. *Id.*

### G.    Development of the RONI and Micro RONI Conversion Kits

CAA Industries' most popular and well-known products are pistol carbine conversion kits sold under the marks RONI and Micro RONI, and their related and spin-off products (collectively the "RONI Products"). Oz decl. ¶26.  A pistol carbine conversion kit is a firearms accessory that enables a user to convert a pistol into a mini carbine (longer gun firearm) to offer better grip, stability, range, and accuracy. *Id.*  A true and accurate copy of a Micro RONI User Manual is shown in Exhibit 4. *Id.*  Moshe Oz named his first conversion kit after his daughter, RONI. *Id.*

The original RONI conversion kit was designed by Moshe Oz prior to July 27, 2010. Oz decl. ¶27.  Moshe Oz and staff from CAA Industries spent approximately 20 months perfecting its design and spent over US$ 2,158,000 for salary, materials, and molds. Exh. 21; Oz decl. ¶27.  A summary of the man-hours and payments made for the RONI is shown in Exhibit 21. *Id.*  The RONI conversion kit is protected by two U.S. patents. Oz decl. ¶27.  U.S. Patent No. 8,887,432 ("the '432 Patent") entitled Handgun Converter issued on November 18, 2014 and is directed to the conversion housing, and U.S. Patent No. 8,312,803 ("the '803 Patent") entitled Semi Automatic Pistol Slide Pull issued on November 20, 2012, and is directed to the slide pull of the conversion kit. Exh. 23; Oz decl. ¶27.  CAA Industries is the owner by assignment of both

13

patents. Oz decl. ¶27.  CAA Industries has manufactured and distributed the RONI conversion kit throughout the world since 2010. *Id.*

The RONI conversion kit initially sold very well throughout the world, especially to governmental users. Oz decl. ¶28.  However, in the U.S., NFA rules severely limited the sales of the RONI. *Id.*  In addition, the weight and price point of the RONI were barriers to increased sales. *Id.*  Therefore, with the assistance of an Israeli design firm Zooid Design and Development, Moshe Oz designed the new and improved Micro RONI conversion kit. *Id.*  The Micro RONI had reduced weight, reduced price, reduced size and reduced pistol insertion time, and improved ergonomics compared to the original RONI conversion kit. *Id.*  CAA Industries spent approximately 20 months perfecting its design and spent over US$ 2,158,000 for salary, materials, and molds. *Id.* A true and correct summary of the man-hours and payments made for the RONI is shown in Exhibit 21.  The Micro RONI conversion kit is also protected by the '432 Patent and the '803 Patent. Exh. 3 and 22.

CAA Industries introduced the Micro RONI conversion kit at the January 2016 SHOT Show, an industry exposition in Las Vegas, and elsewhere worldwide. Oz decl. ¶29.  Since its introduction, the improved Micro RONI has sold very well in the United States and worldwide. *Id.*  Based on the September 2018 ME Technology financials, more than 85% of ME Technology's sales relate to the RONI and Micro RONI conversion kits and related accessories. *Id.*  Today, sales of the Micro RONI conversion kit outpace sales of the RONI conversion kit by six to one. *Id.*

The mark RONI is registered as U.S. Reg. No. 4,352,373 for use in connection with a wide range of firearm accessories, including pistol carbine conversion kits. Oz decl. ¶30.  The '373 Registration is now incontestable. Exh. 1. *Id.*  CAA Industries has used the mark RONI in

the U.S. since at least as early as January 2010. *Id.*  ME Technology has also used the mark

RONI since January 2010 with permission from CAA Industries to sell authentic CAA

Industries' products. *Id.*  CAA Industries has used the mark Micro RONI in the U.S. since at

least as early as January 2016. *Id.*  ME Technology has also used the mark Micro RONI since

January 2016 with permission from CAA Industries to sell authentic CAA Industries' products.

*Id.*  The authentic RONI and Micro RONI conversion kits continue to be manufactured in Israel

by CAA Industries. *Id.*

    The marks CAA, COMMAND ARMS ACCESSORIES, RONI, Micro RONI, Micro, the

Lion Head Marks, the DDP Mark, GEAR UP, and the CAA Trade Dress are collectively referred

to as the "CAA Marks." Oz decl. ¶31.

      **H.**    **Defendants' Trademark Infringement**

    By 2016, the CAA rebranding was complete and sales of CAA products in the United

States were good.  Oz decl. ¶32.  However, beginning in 2018, several business disputes arose

between CAA Industries and ME Technology. *Id.*  Some of the disputes were predicated on the

fact that Moshe Oz and Eldad Oz had owned 100% of both CAA Industries and ME Technology

up until January 15, 2015, when the Oz brothers sold a 51% interest in CAA Industries and ME

Technology to an investment group, Sky of Blue. *Id.*  Moshe Oz continued to run the day-to-day

operations of CAA Industries, and Eldad Oz continued to run the day-to-day operations of ME

Technology. *Id.*  However, when Eldad Oz retired from ME Technology in 2017, the business

disputes started. *Id.*

    Throughout 2018 and early 2019, the parties attempted to negotiate a settlement to their

disputes. Oz decl. ¶33  Numerous business proposals were prepared and exchanged, but no

agreement was ultimately reached. *Id.*  Finally, on June 15, 2019, CAA Industries sent a formal,

written notification (the "Termination Notification") to ME Technology that any permission or implied license to use the CAA Marks was immediately revoked and terminated (the "Termination Notice"). Exh. 26; Oz decl. ¶33.  By this time, ME Technology had already designed and was distributing a knock-off of the Micro RONI conversion kit using the mark MCK. Oz decl. ¶33.  Exhibit 4 shows the authentic Micro RONI conversion kit and ME Technology's knock-off MCK conversion kit. *Id.*  ME was also distributing other products that were not made by CAA Industries. *Id.*

The Termination Notice advised ME Technology of CAA Industries' rights in the mark

CAA, The Lion Head Mark, RONI, Micro RONI, the DDP Mark and  . Oz decl. ¶34. ME Technology did not substantively respond until July 9, 2019, and refused CAA Technology's demands. *Id.*

ME Technology continues to use the marks CAA, RONI, Micro RONI, Micro, the Lion Head Marks, the DDP Mark, GEAR UP, and the CAA Trade Dress on product packaging, brochures and/or the website *www.caagearup.com* even though it is no longer affiliated in any way, is no longer a licensee of, and is no longer an authorized distributor of CAA Industries. Oz decl. ¶35.  True and correct screenshots of the website *www.caagearup.com* are shown in Exhibit 24. *Id.*  True and correct photographs of ME Technology's product packaging are shown in Exhibit 25. *Id.*  ME Technology has no other authorization, express or implied, to use the CAA MARKS or to distribute authentic CAA Industries products. *Id.*

CAA Industries and Defendants are now direct competitors in the firearms accessory industry. Oz decl. ¶36.  In fact, CAA Industries and ME Technology manufacture and sell nearly the same firearms accessories. *Id.*  Both CAA Industries and Defendants have Internet websites on which their respective goods are advertised and promoted. *Id.*  These websites are examined

by the same firearms customers. *Id.*

## I. Defendants' Patent Infringement

To add insult to injury, defendants' MCK conversion kit infringes the '803 Patent.  As described infra in section III(B)(2), defendants' MCK conversion kit is a clear knock-off of the Micro RONI conversion kit. Oz decl. ¶37.  Defendants' MCK conversion kit includes a slide pull that is covered by all of the claims of the '803 Patent. *Id.*  ME Technology's efforts to design the knock-off MCK conversion kit were personally directed by it CEO Mikey Hartman, who had actual knowledge of both the '432 Patent and the '803 Patent at the time.  *Id.*  As the CEO of ME Technology, Hartman was involved in the day-to-day operations of ME Technology. *Id.* Furthermore, Mikey Hartman previously served as the CEO of CAA Industries and was involved in the day-to-day operations of CAA Industries, including prosecution of its patents and trademarks. *Id.*

To add further insult to injury, the MCK conversion kit does not include a trigger guard, which makes it far less safe than the Micro RONI conversion kit. Oz decl. ¶38.  In order to avoid infringing the '432 Patent, ME Technologies omitted the "trigger cover" from the design of the MCK knock-off. *Id.*  However, ME Technology kept the infringing "slide pull" even though Mr. Hartman knew the MCK's slide pull clearly infringed the '803 Patent. *Id.*

## J. Defendant's Website Conversion and Domain Name Hijacking

To add even further insult to injury, ME Technology has "stolen" CAA Industries' website at www.caagearup.com (the "CAA Website") and hijacked the domain name www.caagearup.com by changing the access credentials with GoDaddy.com LLC. Oz decl. ¶39.  Because ME Technology was its exclusive U.S. distributor, CAA Industries provided ME Technology with access to the CAA Website for purposes of uploading the latest product, price

and other information. *Id.*  Around June 2018, ME Technology reported to CAA Industries that

the CAA Website was having technical problems, changed the credentials, told CAA Industries

that it would address the technical problems and then return access of the CAA Website to CAA

Industries. *Id.*  Despite numerous requests over the next several months, ME Technology never

returned access to the CAA Website to CAA Industries. *Id.*  ME Technology continues to use the

CAA Website and its content for its own purpose and profit to advertise and sell its unauthorized

products using the CAA Marks. *Id.*  All of the sales being generated at www.caagearup.com

should be going to CAA Industries, not ME Technology. *Id.*  In the meantime, at additional cost

and effort, CAA Industries had to design and develop a new website at

www.caaindustries.com. *Id.*

## III.   THE LEGAL STANDARD FOR PRELIMINARY INJUNCTIVE RELIEF IN TRADEMARK AND PATENT CASES

Injunctive relief for trademark infringement is expressly authorized under Section 34 of

the Lanham Act, which empowers the District Court to grant injunctive relief to prevent a

violation of any right of the owner of a mark registered in the United States Patent and

Trademark Office, or to prevent a violation of subsections (a), (c), or (d) of section 43 of the

Lanham Act. 15 U.S.C. §1116.  In trademark infringement actions, injunctive relief is

"appropriate where the party seeking the injunction has succeeded on the merits and shows the

absence of an adequate remedy at law and irreparable harm if the relief is not granted." *Mister

Softee, Inc. v. Tsirkos*, No. 14- CV-1975-LTS-RLE, 2015 U.S. Dist. LEXIS 158290, at *12

(S.D.N.Y. Nov. 23, 2015) (quoting *Patsy's Italian Rest., Inc. v. Banas*, 658 F.3d 254, 72-73 (2d

Cir. 2011)).  As this Circuit has recognized, the purpose of federal trademark law is to "secure

the public's interest in protection against deceit as to the sources of its purchases, [and the

businessman's right to enjoy business earned through investment in the good will and reputation attached to a trade name." *Christian Louboutin S.A., et al. v. Yves Saint Laurent Am. Holding, Inc., et al.*, 696 F.3d 206, 215 (2d Cir. 2012) (quoting *Fabrication Enters., Inc. v. Hygenic Corp.*, 64 F.3d 53, 57 (2d Cir. 1995)).  Indeed, federal trademark law provides the owner of a trademark with the "enforceable right to exclude others from using [the mark]." *Christian Louboutin*, 696 F.3d at 216 (quoting *La Societe Anonyme des Parfums le Galion v. Jean Patou, Inc.*, 495 F.2d 1265, 1271 (2d Cir. 1974)).

The U.S. patent statute also expressly provides for injunctive relief "to prevent the violation of any right secured by patent." 35 U.S.C. §283.  Historically, preliminary injunctions have routinely been granted in patent cases because of the special nature of patents. *See e.g., Polymer Techs., Inc. v. Bridwell*, 103 F.3d 970, 975 (Fed. Cir. 1996); *Hybritech, Inc. v. Abbott Labs.*, 849 F.2d 1446, 1457 (Fed. Cir. 1988); *Smith Int'l, Inc. v. Hughes Tool Co.,* 718 F.2d 1573, 1577-78 (Fed. Cir. 1983) ("Without this injunctive power of the courts, the right to exclude granted by the patent would be diminished, and the express purpose of the Constitution and Congress, to promote the progress of the useful arts, would be seriously undermined."), *cert. denied*, 464 U.S. 996 (1983).  CAA Industries need only establish that it is likely to prevail on any underlying claim in order to obtain injunctive relief.  *FTC v. Crescent Publ'g Grp., Inc.*, 129 F. Supp. 2d 311, 323 (S.D.N.Y. 2001).

Courts in this Circuit apply the four-factor test set forth by the Supreme Court in *eBay Inc. v. MercExchange, LLC.* See *Coach, Inc. v. O'Brien*, No. 10 Civ. 6071 (JPO)(JLC), 2012 WL 1255276, at *17 n.7 (S.D.N.Y. Apr. 13, 2012) ("In *Salinger v. Colting*, 607 F.3d 68, 78 n.7 (2d Cir. 2010), this Circuit extended the test articulated by eBay, a patent action involving a permanent injunction, 'to preliminary injunctions in the context of copyright cases[.]' Although

19

this Circuit did not explicitly extend the eBay test to trademark actions, the Court stated that it

saw 'no reason that eBay would not apply with equal force to an injunction in any type of case.'

*Id.* . . . In light of Salinger, district courts in this Circuit have extended eBay to trademark actions

as well.").[9]  Under *eBay*, permanent injunctive relief should be granted where the plaintiff has

established a likelihood of success on the merits, and that "(1) plaintiff is likely to suffer

irreparable injury in the absence of an injunction; (2) remedies at law, such as monetary

damages, are inadequate to compensate plaintiff for that injury; (3) the balance of hardships tips

in plaintiff's favor; and (4) the public interest would not be disserved by the issuance of a

preliminary injunction." *eBay,* 547 U.S. at 391; *Coach*, 2012 WL 1255276, at \*17 (citing

*Salinger*, 607 F.3d at 80).  The same standard applies for preliminary injunctive relief. *Winter v.*

*Natural Resources Defense Council, Inc.*, 555 U.S. 7, 27 (2008).

### A.    CAA Industries Is Likely To Succeed On The Merits of Its Counts For Federal Statutory Trademark Infringement, False Designation of Origin, and Common Law Trademark Infringement

CAA Industries has pleaded separate counts for trademark infringement under Section

32 of the Lanham Act, false designation of origin under Section 43(a) of the Lanham Act, and

common law trademark infringement.  In the Second Circuit, the standards for proving liability

under either count are essentially the same.  *See Van Praagh v. Gratton*, 993 F. Supp. 2d 293,

301 (E.D.N.Y. 2014) (citing *Twentieth Century Fox Film Corp. v. Marvel Enterprises, Inc.*,

220 F. Supp. 2d 289, 297 (S.D.N.Y. 2002); *Nabisco, Inc. v. PF Brands, Inc.*, 50 F. Supp. 2d

188, 212 (S.D.N.Y. 1999); see also *Tri-Star Pictures, Inc. v. Unger*, 14 F. Supp. 2d 339, 363

(S.D.N.Y. 1999).  In order for CAA Industries to prevail on either of its counts, CAA

Industries must prove by a reasonable probability that: (1) CAA Industries' possesses a valid,

---

[9] 547 U.S. 388, 390 (2006)

legally protectable mark; and (2) ME Technology's subsequent use of a similar mark is likely

to cause confusion concerning the source, sponsorship, or affiliation of those goods. *Lane*

*Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.*, 192 F.3d 337, 344 (2d Cir. 1999); *see also*

*Brennan's, Inc. v. Brennan's Rest., LLC*, 360 F.3d 125, 129 (2d Cir. 2004).

1.      <b>CAA Industries Has Proven Ownership of All of the CAA Marks<br>Through Its Incontestable Registration and Proof of First Adoption<br>and Continuous Use</b>

The first requirement, ownership of a valid mark, is proven where a mark is federally

registered and has become incontestable under the Lanham Act. *Lane Capital Mgmt., Inc.*, 192

F.3d at 345 (citing the Lanham Act, 15 U.S.C. § 1115(a)).  Indeed, federal registration of a

mark creates a strong presumption of validity. *See Aluminum Fabrication Co. v. Season-All*

*Window Corp.*, 259 F.2d 314, 316 (2d Cir. 1958) (federal registration provides "a strong

presumption of validity…").  Under Section 33 of the Lanham Act:

> Any registration . . . of a mark registered on the principal register provided by this chapter and owned by a party to an action shall be admissible in evidence and shall be prima facie evidence of the validity of the registered trademark and of the registration of the mark, of the registrant's ownership of the mark, and the registrant's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the registration subject to any conditions or limitations therein . . . .

15 U.S.C. §1115(a) (emphasis added).

CAA Industries owns U.S. Reg. No. 4,352,373 ("the '373 Registration") for the mark

RONI, which is registered for use in connection with a wide variety of firearms accessories.

Exh. 4.  CAA Industries' exclusive right to use the mark RONI is incontestable pursuant to

section 15 of the Lanham Act which recites, in part:

> . . . the right of the registrant to use such registered mark in commerce for the goods or services on or in connection with which such registered mark has been in continuous use for five consecutive years subsequent to the date of such registration and is still in use in commerce, shall be incontestable. . . .

21

15 U.S.C. § 1065.  CAA Industries timely filed a Section 15 affidavit of incontestability for the

'373 Registration, which was acknowledged and accepted by the U.S.P.T.O. on July 31, 2019.

Ex. 1.  This Court may take judicial notice of this official public record.  Therefore, CAA

Industries' incontestable registration proves CAA Industries' ownership of valid exclusive rights

in the mark RONI.

     CAA Industries is also the owner of U.S. Reg. No. U.S. 3,559,649, now abandoned, for

the mark ![CAA mark], and U.S. Reg. No. 4,352,407 for the mark ![CAA mark].  Exh. 27, 28.  These

composite marks (words plus design) are no longer used by CAA Industries but are relevant

since they support CAA Industries' lineage claim to exclusive rights in the marks CAA and

COMMAND ARMS ACCESSORIES.

     In addition to the registered mark RONI, CAA Industries possesses common law rights in

the marks CAA, COMMAND ARMS ACESSORIES, Micro RONI, Micro, the Lion Head Mark,

the Lion Head Composite Mark, the DDP Mark, GEAR UP, and the CAA Trade Dress.  CAA

Industries has established ownership in these common law marks since it was the first party to

adopt each mark and has continuously used each mark in commerce since its adoption. *See*

*Excelled Sheepskin & Leather Coat Corp. v. Or. Brewing Co.*, 897 F.3d 413, 418 (2d Cir. 2018)

(citing *La Societe Anonyme Des Parfums le Galion v. Jean Patou, Inc.*, 495 F.2d 1265, 1271-72

(2d Cir. 1974)); *Hydro-Dynamics, Inc. v. George Putnam & Co., Inc.*, 811 F.2d 1470, 1473 (Fed.

Cir. 1987).  Plaintiff's first and continuing use of its common law marks was described in detail

in section II.

     Plaintiff Command Arms Accessories, LLC purchased the marks CAA, COMMAND

ARMS ACCESSORIES and ![CAA mark] from another entity named Command Arms Accessories,

LLC through an Asset Purchase Agreement dated December 15, 2010. Exh. 13; Oz decl. ¶12.

Plaintiff CAA Industries invented and first introduced the Micro RONI conversion kit at the SHOT show in Las Vegas in January 2016. Oz decl. ¶29.  Plaintiff CAA Industries hired a marketing firm, Dan Alexander & Co., in 2015 to develop the Lion Head Marks, the DDP Mark and the CAA Trade Dress, which CAA first used in 2016. Exh. 15-18; Oz decl. ¶18.  The mark GEAR UP was created and adopted by CAA Industries in 2015 as a trademark and part of its domain name.  Plaintiff's common law marks are summarized below in Table I:

### Table I – Common Law Marks

| Mark | Dates of Use | Basis of Ownership Claim |
|---|---|---|
| CAA | 2005 till now | Asset Purchase Agreement December 15, 2010 |
| COMMAND ARMS ACCESSORIES | 2005 till now | Asset Purchase Agreement December 15, 2010 |
| **CAA** (logo) | July 19, 2005 till 2010 | Asset Purchase Agreement  U.S. Reg. No. U.S. 3,559,649, now abandoned. |
| CAA (logo) | January 2010 till 2016 | U.S. Reg. No. 4,352,407 |
| Micro RONI | January 2016 till now | First Use at the 2016 SHOT Show |
| Micro[10] | January 2016 till now | First Use at the 2016 SHOT Show |
| (logo) ("Lion Head Mark") | 2015 to present | Created by Dan Alexander & Co. on behalf of CAA Industries |
| (logo) CAA ("Lion Head Composite Mark") | 2015 to present | Created by Dan Alexander & Co. on behalf of CAA Industries |
| (image) ("DDP Mark") | 2015 to present | Created by Dan Alexander & Co. on behalf of CAA Industries |
| GEAR UP | 2015 to present | Created by CAA Industries |
| CAA Trade Dress | 2015 to present | Created by Dan Alexander & Co. on behalf of CAA Industries |

---

[10] Trademark rights in the mark Micro vest by virtue of fact that Micro is presented in a different font and creates a separate and distinct commercial impression apart from the mark Micro RONI. T.M.E.P. 807.12(d).

These uncontroverted facts establish Plaintiffs as the owners of each of the registered and unregistered marks, collectively referred to as the CAA Marks.

Having proven ownership of exclusive rights in the CAA Marks, CAA Industries must only prove that a likelihood of confusion results from Defendant's infringing use of the CAA Marks to prevail on its counts under the Lanham Act and at common law.

> ### 2. ME Technology's Hold-Over Use of the CAA Marks Creates Confusion as to the Source or Sponsorship of Its Firearms' Accessory Products

In determining the likelihood of confusion, the Court looks to the nonexclusive factors established in the Polaroid case: (1) the strength of the mark; (2) the degree of similarity between the two marks; (3) the proximity of the products; (4) the likelihood that the prior owner will "bridge the gap"; (5) actual confusion; (6) the defendant's good faith in adopting its mark; (7) the quality of the defendant's product; and (8) the sophistication of the buyers. *Polaroid Corp v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961); s*ee also Arrow Fastener Co., Inc. v. Stanley Works*, 59 F.3d 384, 391 (2d Cir. 1995).  Each of these factors strongly weighs in favor of CAA Industries.

The language of the Lanham Act is broad enough to cover "the use of trademarks which are likely to cause confusion, mistake, or deception of any kind, not merely purchasers nor simply as to source of origin." *United States v. Nam Ping Hon*, 904 F.2d 803, 807 (2d Cir. 1990) (citing *Syntex Labs. V. Norwich Paracal Co.*, 437 F.2d 566, 568 (2d Cir. 1971).  Any doubts as to whether a likelihood of confusion exists must be resolved in favor of the senior user. *Schutte Bagclosures Inc. v. Kwik Lok Corp.*, 48 F. Supp. 3d 675, 700 (S.D.N.Y. 2014) (collecting cases).

      **a.**      **Factors 2, 3, 4 and 6 - ME Technology's Status As a Former Distributor and Hold-Over Licensee Presumptively Weighs Polaroid Factors 2, 3, 4 and 6 in CAA Industries' Favor**

The likelihood of confusion analysis in this case can be truncated due to the nature of the infringement.  Prior to June 5, 2019, ME Technology was an authorized distributor for CAA Industries' products and was using the CAA Marks by permission of CAA Industries.  On June 15, 2019, ME Technology was formally notified by CAA Industries that any permission or implied license to use the CAA Marks was immediately revoked and terminated (the "Termination Notice"). Exh. 26.  Despite this termination, ME Technology continues to use the CAA Marks.  Therefore, *Polaroid* factors 2, 3, 4, and 6 weigh heavily in CAA's favor and are summarily discussed below.

**Factor 2** – There is no dispute that ME Technology is using marks that are *identical* to the CAA Marks, thereby weighing *Polaroid* factor 2 in CAA Industries' favor.  A key factor in determining likelihood of confusion is the similarity of the marks. *Knowles-Carter v. Feyonce, Inc.*, 347 F. Supp. 3d 217, 225 (S.D.N.Y. 2018) (citing *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 454 F.3d 108, 117 (2d Cir. 2006).  ME Technology continues to use the CAA Marks in the same manner in which it did prior to the Termination Notice.  For example, the tagline for ME Technology website reads "Home of the MCK & Micro RONI." Exh. 24.  The home page prominently displays the Lion Head Composite Mark  in the top, left corner, while the DDP Mark  appears along the bottom of the home page. *Id.*  ME Technology uses the tradename CAA USA in print and pictures throughout the site. *Id.*  One page is entitled "MCKS & RONIS" and reads "HOME OF THE MCK & Micro RONI". *Id.*  Under the category of "Micro RONI & RONI", the website shows 26 products. *Id.*  ME Technology identifies the MCK conversion kit as the "**Micro** Conversion Kit." *Id.*  The MCK conversion kit itself is

stamped with mark MICRO CONVERSION KIT as well as the mark MCK. Exh. 31.  Product

packaging and some products bear the mark "CAA USA". Exh. 24, 25.  These facts are not

surprising since ME Technology hijacked the website www.caagearup.com, which was designed

and developed by CAA Industries at a cost of more than US$ 28,000.  See section II(J) *supra*.

Factor 3 - There is no dispute that the goods are not only proximate, but in fact are

*identical*, and the parties are trading in the exact same product line, thereby weighing *Polaroid*

factor 3 in CAA Industries' favor. Oz decl. ¶40.  ME Technology continues to sell the exact

same firearms accessory products as it did prior to the Termination Notice. *Id.*  ME Technology

is now a direct competitor of CAA Industries and is selling its goods through the same trade

channels and to the same prospective customers. Oz decl. ¶¶ 39-41.  The proximity between the

defendants' and the plaintiff's services is relevant because "where the products are in some

degree competitive, the degree to which consumers are likely to be confused as between the

products themselves is a function of the competitive proximity of the products." *Lawn Tennis*

*Ass'n v. British Tennis Agency, Inc.,* 1986 U.S. Dist. LEXIS 22852, at *18 (S.D.N.Y. July 14,

1986) (citing *Lambda Elecs. Corp. v. Lambda Tech., Inc.*, 515 F. Supp. 915, 926 (S.D.N.Y.

1981). ).)

Factor 4 - The fourth *Polaroid* factor, likelihood that the prior owner will "bridge the

gap," is inapplicable because the parties' goods are already in direct competition with each other.

*See, e.g., Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 115 (2d Cir. 2009).

Thus, this factor should be weighed in CAA Industries' favor since any "gap" has already been

"bridged."

Factor 6 - ME Technology has stated no legally justifiable reason for holding over and

continuing to use the CAA Marks, thereby weighing *Polaroid* factor 6 in CAA Industries' favor.

The Termination Notice advised ME Technology of CAA Industries' rights in the mark CAA,

The Lion Head Mark, RONI, Micro RONI, the DDP Mark and **CAA**.  In a written response

to the accusations of trademark infringement in the Termination Notice, ME Technology's

counsel wrote:

> "Fourth, with regard to your various claims of violations of copyright, I have
> found that your client has only 2 registered copyrights, one for "CAA" (with a
> little soldier), and one for "RONI."  CAA USA is using those copyrights only in
> connection with the sale of CAA Israel's products that CAA USA is legitimately
> reselling with permission.  Such use is not a violation of CAA Israel's
> copyrights."

Exh. 29.  CAA Industries disputes this legal conclusion.  More importantly, however, the letter

failed to address CAA Industries' common law rights to the marks CAA, Micro, the Lion Head

Marks, or the DDP Marks.  Use of these marks creates the overall impression that ME

Technology is still the authorized, exclusive distributor of CAA Industries' products in the U.S.

Without any stated justification, ME Technology's bad faith can be presumed and weighs this

factor in favor of CAA Industries.

### b.    Factor 1- The CAA Marks Are Strong and Entitled to Broad Protection Since They Are Inherently Distinctive

The strength of a mark is measured by (1) the distinctiveness or conceptual strength of

the mark; and (2) the commercial strength or marketplace recognition of the mark. *Citigroup Inc.*

*v. City Holding Co.*, 171 F. Supp. 2d 333, 345 (S.D.N.Y. 2001) (citing *Time, Inc. v. Petersen*

*Publ'g Co.*, 173 F.3d 113, 118 (2d Cir. 1999)).  The first prong of the test weighs the inherent

features of the mark, while the second prong weighs the factual evidence of marketplace

recognition. *Citigroup* at 345.

**RONI, Micro RONI and Micro** – The mark RONI is inherently distinctive and

conceptually strong for several reasons.  First, the mark RONI was registered on the Principal

Register without the need to claim acquired distinctiveness or "secondary meaning."[11] Exh.1.  As discussed above, the '373 Registration is incontestable evidence of CAA Industries' exclusive right to use the marks in connection with firearms accessories. 15 U.S.C. § 1115(a).  Therefore, this mark is inherently distinctive and conceptually strong. See 15 U.S.C. § 1065.  The mark Micro RONI is inherently strong since it tacks strength from the registered mark RONI.

The mark Micro is either arbitrary[12] or suggestive[13].  The word micro means: (1) "very small, especially: microscopic; (2) involving minute quantities or variations." *Merriam-Webster.com* 2019. https://www.merriam-webster.com/dictionary/hacker (13 August 2019).  The word "micro" applies to a wide variety of products and organisms and is normally associated with electronics components (e.g. microchip), medical devices (e.g. microblade), or microorganisms.  The word itself tells nothing about the nature or function of the product except perhaps its minute size.  In this case, however, CAA Industries' conversion kit does not have a minute size that would be considered microscopic as the definition applies.  Nor is the word "micro" used in the relevant industry to describe conversion kits.  Since the word "micro" requires imagination, thought, or perception to reach a conclusion as to the nature of CAA Industries' goods, the word "micro" is at least suggestive of conversion kits, and therefore inherently distinctive.

---

[11] Marks which are not inherently distinctive may be registered on the Principal Register by claiming "secondary meaning" or "acquired distinctiveness" under Section 2(f) of the Lanham Act.

[12] "Arbitrary marks comprise words that are in common linguistic use but, when used to identify particular goods or services, do not suggest or describe a significant ingredient, quality, or characteristic of the goods or services (e.g., APPLE for computers; OLD CROW for whiskey)." T.M.E.P. 1209(a)(citations omitted).

[13] Suggestive marks are those that, when applied to the goods or services at issue, require imagination, thought, or perception to reach a conclusion as to the nature of those goods or services. Thus, a suggestive term differs from a descriptive term, which immediately tells something about the goods or services. T.M.E.P. 1209(a)(citations omitted).

The strength of the marks RONI, Micro RONI and Micro has been further enhanced and multiplied by commercialization.  The strength of the mark RONI has been enhanced and multiplied by virtue of the fact that CAA Industries has used and promoted the mark RONI for more than 9 years. Oz decl. ¶10.  CAA Industries has used and promoted the marks Micro RONI and Micro for more than 3-1/2 years and has become much more popular than the mark RONI. Oz decl. ¶29.  Today, sales of the Micro RONI conversion kit outpace sales of the RONI conversion kit by six to one. *Id.*  From 2014 through October 29, 2019, CAA Industries sold millions of dollars' worth of RONI and Micro RONI conversion kits and accessories in the U.S. through ME Technology. *Id.*

**CAA, COMMAND ARMS ACCESSORIES**, , **DDP Mark, GEAR UP and CAA Trade Dress** -  These marks are all strong since they are inherently distinctive.  The marks CAA and COMMAND ARMS ACCESSORIES are either arbitrary or suggestive.  CAA has no known meaning as a word or acronym.  The word "command" is suggestive of the military but not firearms accessories.  The Lion Head Mark, DDP Mark, and CAA Trade Dress are totally unique and originally created for CAA Industries by Dan Alexander & Co. Oz decl. ¶18.  The mark GEAR UP is totally unique and originally created independently by CAA Industries. Oz decl. ¶24.

Furthermore, the inherent strength of the marks these marks has been enhanced and multiplied by commercialization and promotion.  CAA Industries has used and promoted the marks CAA and COMMAND ARMS ACCESSORIES marks for almost 15 years.  The Lion Head Composite Mark tacks strength from the mark CAA since the lettering CAA is a prominent portion of the composite mark.  The Lion Head Mark, DDP Mark, GEAR UP, and CAA Trae Dress have been used continuously since January 206. Oz decl. ¶¶19, 22, 23.  Through

29

continuous use, advertising and promotion, these marks have become very strong and entitled to broad protection.

### c.  Factor 5 - Defendants' Use of the Infringing Marks Began Only Recently

A plaintiff need not present evidence of actual confusion to establish likelihood of confusion under the Lanham Act.  *Fischer v. Forrest*, 286 F. Supp. 3d 590, 613 (S.D.N.Y. 2018) (citing *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 868 (2d Cir. 1986)). Although such evidence is extremely persuasive if it exists, it is not a prerequisite to a finding of infringement. *Gucci v. Gucci Shops*, 688 F. Supp. 916, 926 (S.D.N.Y. 1988) (citing cases)). Since ME Technology has only been unlawfully using the CAA Marks for a very short period of time, actual confusion in the marketplace is in its infancy.  However, ME Technology's use of the CAA Marks is certain to at least cause "initial interest confusion."

Both CAA Industries and ME Technology use the Internet to attract customers.  ME Technology's use of the CAA Marks creates a likelihood of confusion by wrongfully diverting customers to the wrong website.  Each time a customer is unlawfully linked to ME Technology's website instead of CAA Industries' website, CAA Industries may lose a customer, even if the customer eventually discovers ME Technology's true identity.  Where a party captures customers using another's marks, the party may be liable for infringement based on the theory of initial interest confusion, even where a purchaser knows the source of the goods. *See Generally 1-800 Contacts, Inc. v. WhenU.com*, 309 F. Supp. 2d 467, 491 (S.D.N.Y. 2003) rev'd on other grounds, *1-800 Contacts, Inc. v. WhenU.com*, 414 F.3d 400, 406 (2d Cir. 2005)  (citing *Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 259 (2d Cir. 1987) (Confusion that occurs prior to a sale, including initial interest confusion, is actionable under the Lanham Act, including when the consumer is not actually confused about the source of the goods); 3 J. McCarthy on

Trademarks and Unfair Competition, § 23:6 ("[Trademark infringement] can be based upon confusion that creates initial customer interest, even though no actual sale is finally completed as a result of the confusion").

### d.    Factor 6 – Defendants are Willfully Holding-Over and Intentionally Infringing the CAA Marks

Evidence of intentional adoption of a mark that is closely similar to the senior user's mark weighs strongly in favor of finding a likelihood of confusion. *Katz v. Modiri*, 283 F. Supp. 2d 883, 897 (S.D.N.Y. 2003) (citing *Perfect Fit Indus., Inc. v. Acme Quilting Co.*, 618 F.2d 950, 954 (2d Cir. 1980)). The defendant's purpose of deceiving prospective purchasers and its knowledge of similar marks or allegations of potential confusion are highly relevant. *Perfect Fit Indus.*, 618 F.2d at 954. A junior party's intent will indicate a likelihood of confusion in the marketplace if an intent to confuse consumers is demonstrated via purposeful manipulation of the junior user's mark to resemble the senior user's mark. *A&H Sportswear*, 237 F.3d 225-26 (emphasis added).

There is no rational, lawful explanation for ME Technology's use of the CAA Marks. None of CAA Industries' marks is descriptive of firearms accessories or is commonly used in the fastener solutions industry. In the face of such evidence, defendant cannot plausibly claim to be an innocent infringer. When a company knowingly adopts a mark similar to another's mark, the court should presume intent to deceive the public. *See AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 354 (9th Cir. 1979).

### e.    Factor 7 – Defendant Is Selling an Inferior Conversion Kit

As discussed above, the quality if the MCK conversion kit is inferior to the genuine Micro RONI conversion kit. For example, the MCK conversion kit does not include a trigger guard. This structural omission indisputably makes the MCK conversion kit less safe than the

Micro RONI conversion kit.  By omitting the trigger guard, ME Technology may have avoided infringement of the '432 Patent, but such omission is endangering consumers and the surrounding public.  Therefore, this factor weighs heavily in favor of CAA Industries.

### f.  Factor 8 – The Sophistication of Customers for Firearms' Accessory Products is Diverse

Due to the diversity of the parties' customer base, it is difficult to assess the sophistication of consumers.  However, CAA Industries and ME Technology are selling nearly identical products and many of the parties' goods are very inexpensive.  Because of the low cost of many of products and the excellent reputation associated with the CAA Marks, consumers may no longer carefully investigate the source of firearms accessory products bearing the CAA Marks or colorable imitations thereof.

Even if great care is taken by customers when purchasing fastener products, "it has been held that the care with which consumers select a product does not impact the association they may make regarding *sponsorship* of another product or service; therefore even a high degree of care would have little effect on confusion of *sponsorship*." 3A Louis Altman, Callman on Unfair Competition, Trademarks & Monopolies § 21:10 & n. 139 (emphasis added).  Even if careful consumers are able to discern the separate identities of CAA Industries and ME Technology, such consumers are likely to believe that ME Technology is somehow still *sponsored* by or affiliated with CAA Industries.

### B.  CAA Industries Will Likely Succeed on the Merits for Patent Infringement

Initially, CAA Industries is required to show that ME Technology likely infringes only one claim in the patent. *Purdue Pharma L.P. v. Boehringer Ingelheim GmbH,* 237 F.3d 1359, 1363 (Fed. Cir. 2001).  However, in this case, CAA Industries can prove infringement of all seven claims of the '803 Patent.

The first step in determining whether a patent is infringed is for the court to decide the proper scope and meaning of the claims of the patent. *Interactive Gift Express, Inc. v. Compuserve, Inc.*, 256 F.3d 1323, 1351 (Fed. Cir. 2001).  The court can make a tentative claim construction in the preliminary injunction motion setting. *Aventis. v. Barr Labs., Inc.*, 411 F.Supp.2d 490, 495 (D. N.J.), *aff'd*, 208 Fed.3d 842 (Fed. Cir. 2006).  In the second step, the product alleged to be infringed is compared to each claim in the patent to determine whether the product contains every limitation recited in a claim or the substantial equivalent of any limitation not literally present. *Oakley, Inc. v. Sunglasses Hut Inter.*, 316 F.3d 1331, 1339 (Fed. Cir. 2003). The test, however, "does not require that infringement be proven beyond all question, or that there be no evidence supporting the viewpoint of the accused infringer." *Larami Corp. v. Lanard Toys Ltd.*, 1992 WL 13683, at *1 (E.D. Pa. Jan. 24, 1992) (quoting *HH Robertson Co. v. United Steel Deck, Inc.*, 820 F.2d 384 (Fed. Cir. 1987).

### 1.  CAA Industries' Patent Is Presumed Valid and ME Technology Will Not Be Able To Present Evidence to Substantially Question Validity

Patents are presumed valid on a motion for preliminary injunction. *See HH Robertson Co.* at 387.  This presumption is based on the law that a "grant of a patent is the grant of the right to invoke the state's power in order to exclude others from utilizing the patentee's discovery without his consent." *Smith Int'l*, 718 F.2d at 1577.  CAA Industries' patent is legally presumed valid under 35 U.S.C. § 282, which states:

> A patent shall be presumed valid.  Each claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; dependent or multiple claims shall be presumed valid even though dependent upon an invalid claim.
> . . .
> The burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity.

33

35 U.S.C. § 282.  This presumption is based in part on the expertise of patent examiners who are presumed to have done their job. *Brooktree Corp. v. Advance Micro Devices, Inc.*, 977 F.2d 1555, 1574, 24 U.S.P.Q.2d 1401, 1414 (Fed. Cir. 1992).  The presumption of validity is applicable to every one of the many grounds challenging the validity of a patent, including nonobviousness under Section 103. *Panduit Corp. v. Dennison Mfg. Co.,* 810 F.2d 1561, 1570 (Fed. Cir. 1987); *Hybritech Inc. v. Monoclonal Antibodies, Inc.,* 802 F.2d 1367, 1375 (Fed. Cir. 1986).  Each claim of a patent is presumed valid independent of the validity of any other claim. 35 U.S.C. § 282; *Bausch & Lomb, Inc. v. Barnes-Hind/Hydrocurve, Inc.,* 796 F.2d 443, 446 (Fed. Cir. 1986).

The '803 Patent was duly issued by the United States Patent and Trademark Office, and is active and in force. Exh. 3.  The court may take judicial notice of this official federal government record.

Defendant has the burden of showing invalidity. *Tate Access Floors, Inc. v. Interface Architectural Resources, Inc.*, 279 F.3d 1357, 1365 (Fed. Cir. 2002) (internal citations omitted). In order to overcome the presumption of validity, Defendant would have a heavy burden. Defendant must raise a <u>substantial question</u> with respect to the validity of the patent. *See Hybritech Inc. v. Abbott Labs.*, 849 F.2d 1446, 1457 (Fed. Cir. 1988); *Sanofi-Synthelabo v. Apotex*, 470 F.3d 1368, 1374 (Fed. Cir. 2006).

### 2.  CAA Industries Can Demonstrate a Strong Case for Infringement of the '803 Patent

The MCK conversion kit not only directly infringes the '803 Patent under 35 U.S.C. § 271(a), but was designed to be a knock-off of CAA's Micro RONI conversion kit.  A side-by-side comparison of the infringing MCK and the Micro RONI is shown photo 1 of Exhibit 30. The meaning of the terms set forth in the claims is simple and clear.  No special *Markman*

[14]hearing is required to discern the meaning of claim elements.  Photos 2-6 of Exhibit 30 show

the structure of the slide pull of the infringing MCK that satisfies each of the elements of claim

1, which recites:

> 1.  A slide pull apparatus for aiding in pulling a slide on a semi-automatic
> pistol, the slide pull apparatus comprising a shell configured to partially enclose a
> rear portion of a slide on a semi-automatic pistol said shell including:
>> i)   a plate having an aperture of a size configured to surround at least a
>>       portion of a rear aim sight on the semi-automatic pistol; and
>> ii)  at least one finger tab projecting from said slide pull, said finger tab
>>       having a size configured to accommodate at least one finger of a
>>       human hand, wherein pulling on said at least one finger tab in a
>>       rearward direction causes said slide to move in a rearward direction,
>>       thereby facilitating loading of the semi-automatic pistol.

Exhibit 30 leaves no doubt that ME Technology's MCK conversion kit infringes the '803 Patent.

The '803 Patent has 6 more claims that are also directly infringed by the slide pull of the

MCK conversion kit.  Claim 2 recites:

> 2.  The apparatus according to claim 1, including two side-walls extending
> downward from said plate, each of said two sidewalls having an inner surface
> configured to each rest against a side portion of a slide of the semi-automatic
> pistol.

Photo 7 of Exhibit 30 shows the additional structure of the slide pull of the infringing MCK that

satisfies each element of claim 2.

> Claim 3 recites:

> 3.  The apparatus according to claim 2, wherein said inner surface of at least one
> of said two sidewalls includes at least one rib configured to offset at least a
> portion of said at least one of said two sidewalls from said slide of said semi-
> automatic pistol.

Photo 7 of Exhibit 30 also shows the additional structure of the slide pull of the infringing MCK

that satisfies each element of claim 3.

---

[14] *Markman v. Westview Instruments, Inc.,* 517 U.S. 370, 376 (1996) holding that language of a patent is a matter of
law for a judge to decide, not a matter of fact for a jury to decide.

Claim 4 recites:

4.  The apparatus according to claim 2, wherein said inner surface of each of said two sidewalls includes at least one rib configured to offset at least a portion of said respective sidewall from said slide of said semi-automatic pistol.

Photo 7 of Exhibit 30 also shows the additional structure of the slide pull of the infringing MCK that satisfies each element of claim 4.

Claim 5 recites:

5.  The apparatus according to claim 2, wherein said at least one finger tab projects laterally outward from at least one outer surface of said two side walls.

Photo 7 of Exhibit 30 also shows the additional structure of the slide pull of the infringing MCK that satisfies each element of claim 5.

Claim 6 recites:

6.  The apparatus according to claim 2, wherein said at least one finger pull comprises two finger tabs, each projecting laterally outward from a respective outer surface of one of said two sidewalls.

Photo 7 of Exhibit 30 shows the additional structure of the slide pull of the infringing MCK that satisfies each element of claim 30.

Claim 7 recites:

1.  A slide pull apparatus for aiding in pulling a slide on a semi-automatic pistol, the slide pull apparatus comprising a shell configured to partially enclose a rear portion of a slide on a semi-automatic pistol said shell including:

   i)   a plate having an aperture of a size configured to surround at least a portion of a rear aim sight on the semi-automatic pistol;
   ii)  two sidewalls extending downward from said plate, each of said two sidewalls having an inner surface having a projection configured to each rest against a side portion of a slide of the semi-automatic pistol; and
   ii)  one finger tab projecting laterally outward from an outer surface of each of said sidewalls, said finger tab having a size configured to accommodate at least one finger of a human hand, wherein pulling on at least one finger tab in a rearward direction causes said slide to move

36

in a rearward direction, thereby facilitating loading of the semi-
automatic pistol.

Photos 1-7 of Exhibit 30 show the same structure of the slide pull of the infringing MCK that

satisfies each of the element of claim 7.

Furthermore, the evidence clearly shows that ME Technologies was aware of the '803

Patent when it designed the MCK conversion kit, knew the MCK knock-off infringes the '803

Patent, but decided to make and sell it anyway.  For example, defendant Michael Hartman was

the CEO of CAA Industries until September 15, 2016. Oz decl. ¶37.  During that time, Mr.

Hartman was intimately involved in all of the day-to-day operations of CAA Industries including

its patent portfolio (including the '432 Patent and '803 Patent) and patenting efforts. *Id.*  Then,

on September 15, 2016, Hartman left the employ of CAA Industries and became the CEO of ME

Technology. *Id.*  Mr. Hartman is involved in all of the day-to-day operations of ME Technology,

which is a very small company. *Id.*  In 2018, Hartman personally directed ME Technology's

design activities for the MCK. *Id.*  The MCK is a near exact copy of the Micro RONI except,

notably, for the omission of a trigger guard, which was omitted in order to avoid infringing the

'432 Patent. *Id.*  However, ME Technology kept the infringing "slide pull" even though Hartman

knew about the '803 Patent and knew that the MCK's slide pull infringed the '803 Patent. *Id.*

**C.     CAA Industries Is Suffering Irreparable Harm and Remedies at Law Are
        Inadequate to Compensate CAA Industries for that Harm**

The United States Supreme Court recently held that a presumption of irreparable harm no

longer exists in patent infringement cases. *eBay Inc. v. MercExchange L.L.C.*, 547 U.S. 388, 393

(2006).  This Circuit extended that ruling to trademark cases. *Salinger v. Colting*, 607 F.3d 68,

78 n.7 (2d Cir. 2010).  Despite the lost presumption, CAA Industries can demonstrate irreparable

harm for several reasons.

1.    **CAA Industries' Loss of Control Over Its Name, Reputation and Goodwill Constitutes Irreparable Harm for Which Monetary Damages Are Inadequate to Compensate Plaintiff**

It is still well settled that in actions for trademark infringement and unfair competition, under common law and under the Lanham Act, the loss of a plaintiff's control over its reputation and goodwill is an irreparable injury for which preliminary injunctive relief is appropriate. *See N.Y.C. Triathlon, LLC v. NYC Triathlon Club, Inc.*, 704 F. Supp. 2d 305, 343 (S.D.N.Y. 2010) (citing *Power Test Petroleum Distribs., Inc. v. Calcu Gas, Inc.*, 754 F.2d 91, 95 (2d Cir. 1985)); *Mitsubishi Motors N. Am. Inc. v. Grand Auto., Inc.*, No. CV 18-814 (SJF) (SIL), 2018 U.S. Dist. LEXIS 72349, at *16 (E.D.N.Y. Apr. 30, 2018) (citing cases).  Lack of control amounts to irreparable injury "even though the borrower does not tarnish it, or divert any sales by its use" *Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 195 (3rd Cir. 1990) (citing *Yale Elec. Corp. v. Robertson*, 26 F.2d 972, 974 (2d Cir. 1928)), or even if "the infringer is putting the mark to better use." *Empresa Cubana Del Tabaco v. Culbro Corp.*, 2004 U.S. Dist. LEXIS 7443, at *10 (S.D.N.Y. Apr. 30, 2004) (quoting *Processed Plastic Co. v. Warner Communications, Inc.*, 675 F.2d 852, 858 (7th Cir. 1982)).  The U.S.D.C. for the Eastern District of New York recently reiterated that a court may find irreparable harm by permissible inference. *Kuklachev v. Gelfman*, 629 F. Supp. 2d 236, 250 (E.D.N.Y. 2008).

In the firearms industry, name and reputation are critical to a company's continued success. Oz decl. ¶41.  CAA Industries' name and reputation are its most valuable assets. *Id.*  ME Technology's use of the CAA Marks usurps CAA Industries' right to control its name, reputation and goodwill, which are associated with the CAA Marks.  In fact, ME Technology is tarnishing CAA Industries' reputation and goodwill by selling inferior products.  As explained above, ME Technology's MCK conversion kit is inferior and less safe than CAA Industries' Micro RONI

conversion kit because the MCK conversion kit does not include a trigger guard.  However, even if ME Technology's goods were not inferior, CAA Industries would still be entitled to injunctive relief.

> The most corrosive and irreparable harm attributable to trademark infringement is the inability of the victim to control the nature and quality of the defendants' goods. Even if the infringer's products are of high quality, the plaintiff can properly insist that its reputation should not be imperiled by the actions of another.

Empresa, 2004 U.S. Dist. LEXIS 7443 at *10 (quoting *Processed Plastic Co. v. Warner Communications, Inc.*, 675 F.2d 852, 858 (7th Cir. 1982)).

### 2. CAA Industries' Loss of Its Statutory Right to Exclude Constitutes Irreparable Harm for Which Monetary Damages Are Inadequate to Compensate Plaintiff

Prior to *eBay*, the Federal Circuit had authorized district courts to apply a presumption of irreparable harm following judgment of patent infringement and validity to support the issuance of injunctions. *Reebok Int'l Ltd., v. Baker, Inc.*, 32 F.3d 1552, 1556 (Fed.Cir. 1994).  "To hold otherwise [to this presumption] would be contrary to the public policy underlying the patent laws." *Smith Int'l*, 718 F.2d at 1581; *see also Blumenthal Distrib. v. Exec. Chair, Inc.*, No. CV-10-1280 (CBA), 2010 U.S. Dist. LEXIS 142193, at *32 (E.D.N.Y. Nov. 9, 2010).  This is because the patent holder's right to exclude is limited to the term of the patent, which is not suspended during litigation and the "passage of time can work irremediable harm" that only a preliminary injunction can prevent. *HH Robertson Co.,* 820 F.2d at 384.  "[B]ecause the principal value of a patent is its statutory right to exclude, the nature of the patent grant weighs against holding that monetary damages will always suffice to make the patentee whole." *Polymer Techs., Inc.,* 103 F.3d at 976 (quoting *Hybritech Inc.,* 849 F.2d at 1456).

Since *eBay,* the Federal Circuit has "jettisoned the *presumption* of irreparable harm as it applies to determining the appropriateness of injunctive relief." *Bosch v. Pylon Mfg. Corp.,* 659 F.3d 1142, 1149 (Fed. Cir. 2011).  However, the Federal Circuit has warned infringers that "it does not follow that courts should entirely ignore the fundamental nature of patents as property rights granting the owner the right to exclude." *Id.*  "While the patentee's right to exclude alone cannot justify an injunction, it should not be ignored either." *Id.* (citing *Acumed LLC v. Stryker Corp.,* 551 F.3d 1323, 1328 (Fed. Cir. 2008)).  The *Bosch* court further cautioned against ignoring the past presumption of irreparable harm where the plaintiff and defendant both practice the patented technology. *Bosch,* 659 F.3d at 1150.

Unless an injunction is granted, ME Technology, in effect, will become a compulsory licensee of CAA Industries, which would lose its right to exclude others from practicing its patented invention.  "If monetary relief were the sole relief afforded … then … infringers could become compulsory licensees for as long as the litigation lasts." *Atlas Powder Co. v. Ireco Inc.*, 773 F.2d 1230, 1233 (Fed. Cir. 1985); *Hybritech*, 849 F.2d at 1457.  There is no compelling reason that ME Technology <u>needs</u> CAA Industries' patented technology.  ME Technology simply <u>wants</u> to trade off the innovation, hard work and reputation of CAA Industries.

Unless a preliminary injunction is granted, ME Technology's infringement of the '803 Patent will continue to steal from CAA Industries "the advantage of being the pioneer in the field and the market leader." *Norbrook Labs Ltd. v. G.C. Hanford Mfg., Co.*, 126 Fed. Appx. 507, 509 (2d Cir. 2005).  The loss of a reputation of being an innovator in the field is a basis for finding irreparable harm. *Garvey Corp. v. Barry-Wehmiller Design Group, Inc.*, 365 F. Supp. 2d 893, 900 (N.D. Ill. 2005).  CAA Industries deserves the credit of having invented one of the best and most unique pistol carbine conversion kits on the market.

3.     **CAA Industries' Loss of Market Share Constitutes Irreparable Harm for Which Monetary Damages Are Inadequate to Compensate Plaintiff**

Unless a preliminary injunction issues, ME Technology's infringement of the CAA Marks and the '803 Patent will continue to cause CAA Industries to lose market share. The loss of market share is a key consideration in determining whether a plaintiff has suffered irreparable harm. *See Sanofi-Synthelabo,* 470 F.3d at 1383 (recognizing independent basis for determination of irreparable harm based on, *inter alia*, irreversible price erosion and loss of goodwill); *Canon Computer Sys. v. Nu-Kote Int'l., Inc.*, 134 F.3d 1085, 1090 (Fed. Cir. 1998) (affirming finding of irreparable harm based on nature of patented technology and potential loss of market share); *Hybritech, Inc. v. Abbott Labs*., 4 U.S.P.Q.2d 1001, 1015 (C.D. Cal. 1987) (reasoning that harm was irreparable because patent's value, "insofar as it could help [the patentee] establish a market position, create business relationships, and thereby gain a foothold in the market, may be lost. The patent might still be there, but the technology might well have bypassed it, or have found alternatives that are not currently available. In that case [the patentee's] opportunity to establish itself in the market will have been destroyed."), *aff'd*, 849 F.2d 1446 (Fed. Cir. 1988); *see also Tivo, Inc. v. Echostar Communications Corp.*, 446 F.Supp.2d 664, 669-670 (E.D. Tex. 2006).

A preliminary injunction is the only appropriate remedy because money damages would never fully compensate CAA Industries for its loss of market share due to ME Technology's infringement. CAA Industries has spent more than 12 years developing its market share by designing, developing and selling a wide variety of high-quality, innovative firearms accessory products. ME Technology is trying to avoid the time, creativity and hard work needed to independently develop its own market share by impersonating CAA Industries. ME Technology is already cutting into CAA Industries' customer base and market share. As the Federal Circuit

41

has stated, "[c]ompetitors change the marketplace.  Years after infringement has begun, it may

be impossible to restore a patentee's . . . exclusive position by an award of damages and a

permanent injunction.  Customers may have established relationships with infringers.  The

market is rarely the same when a market of multiple sellers is suddenly converted to one with a

single seller by legal fiat." *Polymer Tech.*, 103 F.3d at 975-976; *see also Black & Decker, Inc. v.

Robert Bosch Tool Corp.*, 2006 WL 3446144 (N.D. Ill. Nov. 29, 2006) (patentee's right to

exclude "cannot be compensated through money damages" because "it is impossible to

determine the portions of the market the [patentee] would have secured but for the infringer or

how much damage was done to the [patentee's] brand recognition or goodwill due to the

infringement.").  For these multiple reasons, CAA Industries is suffering, and will continue to

suffer, irreparable harm.

### D.     The Balance Of Hardships Weighs Heavily in CAA Industries' Favor

As detailed above, there is no doubt that ME Technology is infringing the CAA Marks,

that the MCK conversion kit infringes the '803 Patent, and that CAA Industries is suffering

irreparable harm.  These factors alone should compel issuance of a preliminary injunction.  In

addition, the balance of the hardships heavily favors the granting of a preliminary injunction.

### 1.     Any Hardship on ME Technology is Self-Inflicted

Any resultant harm to the nonmoving party that is based in or on its infringement does

not account as a hardship in this evaluation. *See My-T Fine Corp. v. Samuels*, 69 F.2d 76, 78 (2d

Cir. 1934); *WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275, 285 (2d Cir. 2012).  ME Technology can only

blame itself for any hardship it has caused itself because it was aware of the '803 Patent when it

designed the knock-off MCK, and it knew the knock-off MCK infringed the '803 Patent when it

started selling it. *See Rubbermaid Commercial Prods., Inc. v. Contico Int'l, Inc.*, 836 F. Supp.

1247, 1258 (W.D. Va. 1993) (Defendants "knowing entrance into a risky venture lays much of the harm at its own doorstep"). "One who elects to build a business on a product found to infringe cannot be heard to complain if an injunction against continuing infringement destroys the business so elected." *Windsurfing Int'l, Inc. v. AMF, Inc.,* 783 F.2d 995, 1003 n.12 (Fed. Cir. 1986). *See Pfizer, Inc. v. Teva Pharms. USA, Inc*., 429 F.3d 1364, 1382 (Fed. Cir. 2005). The denial of relief to CAA Industries "would effectively extinguish the rights of [CAA Industries] under the guise of protecting the investments of the infringers. This . . . would not be equitable." *Wayne-Gossard Corp. v. Sondra, Inc.,* 434 F.Supp. 1340, 1363 (D.C. Pa. 1977), aff'd, 579 F.2d 41 (3rd Cir. 1978).

This is not a case where ME Technology innocently or unknowingly adopted trademarks or a trade dress similar to the CAA Marks. *See Paco Sport, Ltd. v. Paco Rabanne Parfums,* 86 F. Supp. 2d 305, 324 (S.D.N.Y. 2000). Instead, ME Technology is intentionally refusing to cease and desist using the marks of its licensor. A party cannot claim to be harmed where it has brought any and all difficulties occasioned by the issuance of an injunction upon itself. *See Flores v. Town of Islip,* 382 F. Supp. 3d 197, 250 (E.D.N.Y. 2019) (citations omitted); *Citizens Sec., Inc. v. Bender,* No. 1:19-CV-916 (MAD/DJS), 2019 U.S. Dist. LEXIS 128571, at *14 (S.D.N.Y. Aug. 1, 2019). "[O]ne entering a field already occupied by another has a duty to select a trademark that will avoid confusion." *Bulman v. 2BKCo, Inc.,* 882 F. Supp. 2d 551, 565 (S.D.N.Y. 2012) (citing *Wesley-Jessen Div. of Schering Corp. v. Bausch & Lomb, Inc.,* 698 F.2d 862, 867 (7th Cir. 1983)).

## 2.    CAA Industries Seeks Only Limited Equitable Relief

Despite having demonstrated broad rights in the CAA Marks, CAA Industries only seeks limited equitable relief. In balancing the hardships, the balance often falls in favor of the moving

party because an injunction does not necessarily close down the nonmoving party's business or restrict its ability to freely and fully compete in the marketplace, albeit using non-infringing activities. *See The Marks Org., Inc. v. Joles*, 784 F. Supp. 2d 322, 336 (S.D.N.Y. 2011).

CAA Industries only seeks to protect the goodwill and reputation of its well-known marks, and protect its patented invention. CAA Industries does not seek to enjoin ME Technology from selling all products; rather, CAA Industries merely seeks to enjoin ME Technology from using counterfeits and colorable imitations of CAA Industries' valuable trademarks. Defendants are free to sell firearms accessory products under any other name that does not cause confusion in the marketplace, or dilute CAA Industries' famous marks.

CAA Industries also seeks enjoin ME Technology from commercializing the knock-off MCK conversion kit. CAA Industries is being harmed by its lost patent rights and lost reputation as an innovator. ME Technology has many other non-infringing products. Even if a preliminary injunction would put ME Technology out of business, such a fact should not prevent the Court from granting a preliminary injunction. *WPIX* at 620-21 (S.D.N.Y. 2011) (citing cases). In view of these circumstances, CAA Industries' Proposed Order fairly balances the interests of both parties.

### 3.    Potential Injury to Defendant Is Subservient to Protection of the Public Interest and the Trademark Rights of CAA Industries

The court should not be overly concerned with the possible injury caused to the defendant. "Protection of infringers is not a purpose of the Lanham Act. To the contrary, the Act's objective is the protection of the trademark and the public." *See Rescuecom Corp. v. Google, Inc.*, 562 F.3d 123, 133 (2d Cir. 2009).

An injunction poses little unjustifiable hardship on ME Technology; however, even if the issuance of a preliminary injunction would have a devastating effect on ME Technology's

business, an injunction should still be granted since an infringer should not be permitted to carry out and continue business activities based on infringing activities. *See Les Ballets Trockadero De Monte Carlo, Inc. v. Trevino*, 945 F. Supp. 563, 565 (S.D.N.Y. 1996). Accordingly, the aforementioned equitable considerations tip decidedly in favor of CAA Industries.

> **E.**   **Public Interest Favors Issuance of an Injunction to Enjoin Defendant's Use of the Infringing Marks**

As a practical matter, "if a plaintiff demonstrates both a likelihood of success on the merits and irreparable injury, it almost always will be the case that the public interest will favor preliminary relief." *Saget v. Trump*, 375 F. Supp. 3d 280, 377 (E.D.N.Y. 2019) (quoting *Issa v. Sch. Dist. of Lancaster*, 847 F.3d 121, 143 (3d Cir. 2017)). Nevertheless, additional public interest considerations also weigh heavily in favor of CAA Industries.

> **1.**   **Preventing Consumer Confusion Serves the Public Interest**

Courts generally find that the public interest is served by enforcing the laws against infringing and unfairly competitive activities. *See Mint, Inc. v. Amad*, 2011 U.S. Dist. LEXIS 49813, *11 (S.D.N.Y. 2011). There is also a public interest in avoiding consumer confusion or deception arising from such unlawful acts. *See N.Y.C. Triathlon, LLC v. NYC Triathlon Club, Inc.*, 704 F. Supp. 2d 305, 344 (S.D.N.Y. 2010). "[T]he public interest is best served by removing confusingly similar marks so that the public can more freely access the parties' products." *Id.* (citing *Tecnimed SRL v. Kidz-Med, Inc.,* 763 F. Supp. 2d 395, 417 (S.D.N.Y. Jan.18, 2011)) (specifying that this prong serves the public interest by removing confusing marks from the marketplace); *see also Bulman*, 882 F. Supp. 2d at 566 ("While the Court agrees that the public has an interest in high quality technological products, the quality of a given product is meaningless if the public is confused about which product it is using").

The public interest can be defined in a number of ways, but is most often a synonym for the right of the public not to be deceived or confused  *See Reckitt Benckiser Inc.* v. Motomco Ltd., 760 F. Supp. 2d 446, 457 (S.D.N.Y. 2011) (citing Osmose, Inc. v. Viance, LLC, 612 F.3d 1298, 1321 (11th Cir. 2010)); *Rexall Sundown, Inc. v. Perrigo Co.*, 651 F. Supp. 2d 9, 33 (E.D.N.Y. 2009); *Sola Franchise Corp. v. Solo Salon Studios, Inc.*, No. CV 14-946 (JS) (AKT), 2015 U.S. Dist. LEXIS 38490, at *41-42 (E.D.N.Y. Feb. 9, 2015) (citing cases).  "[T]he public interest is served by preventing customer confusion or deception." *Reckitt*, 651 F. Supp. 2d 9 at 457.  As recognized by the Eighth Circuit, "An injunction protects both consumers and the commercial plaintiff from continuing false advertising.  The fact that § 43(a) was passed to protect consumers as well as competitors is illustrated by the rule that a likelihood of consumer confusion is sufficient for injunctive relief." *Black Hills Jewelry Mfg. Co. v. Gold Rush, Inc.*, 633 F.2d 746, 753 n.7 (8th Cir. 1980).  As stated above, this strong public interest favors enjoining ME Technology's infringing use of the CAA Marks.

It is also well established that "public policy favors protection of the rights secured by valid patents." *Smith Int'l*, 718 F.2d at 1581.  Such rights encourage innovation and investment-based risk, which is the "fundamental purpose of the patent grant." *Sanofi-Synthlabo*, 470 F.3d at 1383.  As stated above, CAA Industries spent more than 34 months and more than US$3,000,000 designing, testing and tooling the revolutionary RONI and Micro RONI conversion kits. Oz decl. ¶27.  Sales of the RONI and Micro RONI represent more than 85% of ME Technology's annual revenue. *Id.* at ¶29.  Public policy favors protecting this enormous business investment.

### 2.    Protecting Public Safety Serves the Public Interest

The nature of CAA Industries' products is special and involves public safety.  Loss of quality control over the quality of the firearms accessory products sold under the CAA Marks

will harm public safety, especially where the products sold by ME Technology are not equal to the high quality of products sold by CAA Industries.  For example, in contrast with the authentic Micro RONI conversion kit, the infringing MCK *does not include a trigger guard*, which makes the MCK far less safe than the authentic Micro RONI because of an accidental discharge of the firearm. Oz decl. ¶38.  Consumers may not notice this fact when they purchase the knock-off MCK.  Any accidental discharge caused by the missing trigger guard may cause human injury (or death) and injury to the reputation of CAA Industries.  Since in this case there is no counter "critical public interest that would be injured by the grant of the preliminary relief," this prong favors CAA Industries' motion for preliminary injunction. *Hybritech*, 849 F.2d at 1458.

## IV.    BOND

ME Technology is trading off CAA Industries' reputation as global leader in the firearms accessories industry.  ME Technology is deceiving the public into thinking it is selling authentic CAA Industries' products.  CAA urgently requests that these infringing activities be preliminarily enjoined.  In view of the willful nature of the infringement, the likelihood of consumer confusion, the tremendous threat to CAA Industries' reputation and goodwill, and the limited nature of the requested injunctive relief, a bond in a modest amount to be determined by this Court should be required.

/
/
/
/
/
/
/
/
/
/

47

## V.      CONCLUSION

For the foregoing reasons, CAA Industries respectfully requests that this court GRANT

the requested preliminary injunctive relief set forth in the accompanying proposed Order.


Date: August 19, 2019                    By: /s/ Frank A. Mazzeo
                                              Frank A. Mazzeo (FM0837)
                                              Joseph M. Konieczny, Sr. (pro hac vice appl.to be filed)
                                              808 Bethlehem Pike, Suite 200
                                              Colmar, PA 18915
                                              Telephone: 215-997-0248
                                              Facsimile: 215-997-0266
                                              fmazzeo@rmkiplaw.com
                                              jkonieczny@ryderlu.com

                                              Attorneys for Plaintiffs